UNITED STATES of America, Plaintiff-Appellee,

v.

Newton Wilkerson ANDERSON, Jr., Defendant-Appellant.

No. 77–5015.

United States Court of Appeals, Fifth Circuit.

June 15, 1978.

Frank K. Martin, Columbus, Ga., for defendant-appellant.

D. L. Rampey, Jr., U. S. Atty., Joseph M. Lawless, Richard E. Nettum, Asst. U. S. Attys., Macon, Ga., for plaintiff-appellee.

Before COLEMAN, HILL and RUBIN, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Newton Wilkerson Anderson, Jr. appeals from a judgment of conviction entered on a jury verdict. Anderson and his co-defendant, who did not appeal, were tried on a one count indictment charging that they conspired with others to violate Title 18, United States Code, Section 2312, Transportation of stolen vehicles, and Title 18, United States Code, Section 2313, Sale or receipt of stolen vehicles. 18 U.S.C.A. § 371. Appellant Anderson was a used car dealer in La Grange, Georgia. Another used car dealer in La Grange, Joe Edward Roberts, who was a professional and personal friend of Anderson, introduced him to Charles Landon Gardner and Joseph Edward Rose. Anderson bought ten stolen vehicles from Gardner and Rose over a six week period during the term of the alleged conspiracy. The government successfully contended that Anderson knowingly participated in the conspiracy.

On this appeal, Anderson asserts: (1) the evidence against him at his trial was insufficient to find him guilty beyond a reasonable doubt, and (2) the district court erred by denying the defense motion to dismiss the indictment with prejudice because the government failed to comply with the discovery requirements of the district court's order, the Jencks Act, 18 U.S.C.A. § 3500, and the doctrine of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finding no merit in these contentions, we affirm.[1]

---

1. One of the defense stratagems was an attempt to impugn the integrity of the prosecution by insinuating some impropriety in the prosecution's decisions not to call Roberts as a witness and not to indict him as a coconspirator, despite his seemingly central role in this conspiracy. We need not discuss, at any great length, Anderson's assertion that the district court's instruction to the jury improperly bolstered and supported the government's case, substantially prejudicing the defense theory of selective prosecution. Brief of Appellant at 13–17. We agree with the government's conclusion that the contention is wholly without merit. Brief of Appellee at 27–29.

To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as "intentional and purposeful discrimination".

## I.

The initial contention Anderson raises on this appeal is that the evidence against him at trial was insufficient to sustain the jury's finding that he was guilty beyond a reasonable doubt. This contention cannot succeed.

Several recent decisions of this Court have reviewed proof of the essential elements of a criminal conspiracy in the context of a challenge to the sufficiency of the evidence. *See, e. g., United States v. Evans*, 572 F.2d 455 (5th Cir. 1978); *United States v. Becker*, 569 F.2d 951 (5th Cir. 1978); *United States v. Caro*, 569 F.2d 411 (5th Cir. 1978); *United States v. Pruett*, 551 F.2d 1365 (5th Cir. 1977). In *United States v. Gutierrez*, 559 F.2d 1278 (5th Cir. 1977), this Court listed the essential elements:

> The essential elements of criminal conspiracy are an agreement to commit a crime followed by an overt act in furtherance of the agreement. There must be proof beyond reasonable doubt that a conspiracy existed, that the accused knew of it, and that the accused with that knowledge, voluntarily became a part of it. *Id.* at 1280 (citations omitted).

 Anderson does not contend, nor could he successfully contend, that the existence of this conspiracy was not adequately established. Indeed, the existence of this conspiracy was clearly established through the testimony of several of its members, most notably Rose and Gardner, who testified in great detail concerning the various stages of this criminal enterprise, including: stealing cars, changing vehicle identification numbers, acquiring false paper work, interstate transportation, and ultimate resale. Rather than challenge the sufficiency of the proof of the conspiracy itself, Anderson urges that the evidence was insufficient to establish his knowing participation in the conspiracy. In conspiracy cases, the issue

whether a particular defendant culpably participated in the conspiracy is a question of fact to be determined by the trier of fact. A finding that Anderson was a knowing and willing participant in the conspiracy was implicit in the jury's finding of guilt here. On appeal, we must affirm a jury's finding of guilt if our review of the record discloses at least slight evidence of a particular defendant's knowing participation in a conspiracy which has been established by other independent evidence. *See generally, e. g., United States v. Bass*, 562 F.2d 967 (5th Cir. 1977); *United States v. Alvarez*, 548 F.2d 542 (5th Cir. 1977); *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976); *United States v. McGann*, 431 F.2d 1104 (5th Cir. 1970), *cert. denied sub nom., Pruitt v. United States*, 401 U.S. 919, 91 S.Ct. 904, 27 L.Ed.2d 821 (1971); *Lopez v. United States*, 414 F.2d 909 (5th Cir. 1969). Here, viewing the evidence in the light most favorable to the government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), there was more than slight evidence of Anderson's knowing and willing participation in the conspiracy.

It would serve no useful judicial purpose to recount the evidence in this one thousand one hundred and sixty-one page transcript. However, one illustrative example of the evidence of Anderson's knowing participation stands out. On or about February 3, 1976, Anderson obtained a 1973 Ford LTD from Gardner and Roberts. This was only the second or third car Anderson had bought from Gardner. At the time the car was delivered to Anderson, a discrepancy existed between the public vehicle identification number plate, the so-called VIN plate, on the car and the vehicle identification number appearing on the paper work. About two days after Anderson obtained the Ford LTD from Gardner and Roberts,

*United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974).

*See also United States v. Johnson*, 577 F.2d 1304 (5th Cir. 1978); *United States v. Murdock*, 548 F.2d 599 (5th Cir. 1977); *United States v. Smith*, 523 F.2d 771 (5th Cir. 1975). We find nothing in this record to suggest,

much less establish *prima facie*, a valid claim of selective or discriminatory prosecution. Therefore, the defense was not prejudiced by the district court's instructions.

*We also do not reach the issues raised in the Motion for New Trial, now pending in the district court.*

he was aware of the fact that the numbers on the paper work did not match the LTD's stamped metal VIN plate, for he called Roberts's wife to ask her if that was the reason she and her husband did not keep the car. The discrepancy was cleared up by changing the stamped metal number on the automobile so that it corresponded with the numbers shown on the paper work! While the car was on Anderson's lot, Gardner removed the dashboard, took the VIN plate from the dashboard, and carried the VIN plate and a scrap of paper bearing the vehicle identification number as it appeared on the paper work to Rose, who arranged to have the VIN plate changed to correspond with the paper work. Rose and Gardner then returned to Anderson's lot where they replaced the altered VIN plate in the dashboard of the car.

Whether or not Anderson actually saw Rose and Gardner change the VIN plate is immaterial, for the jury was fully warranted in concluding that Anderson was aware that the VIN plate on the automobile was being changed to conform to the paper work. Neither Rose nor Gardner had the Alabama paper work on the car when they made the change, so the jury could conclude that the paper work remained in Anderson's possession. Since the VIN plate eventually matched the unchanged paper work, the jury could conclude that Anderson knew the plate had been altered, which knowledge was more than enough to put him on notice early in February of 1976 that he was dealing with thieves who were selling him stolen automobiles.[2]

In addition to the events surrounding the identification number discrepancy on the 1973 Ford LTD, there were numerous other factors and circumstances which warranted the jury's conclusion that Anderson was a purposive participant in the conspiracy to deal in stolen automobiles. After careful consideration of the alleged weaknesses in the proof asserted in Anderson's brief, the government's contentions, and our own independent review of the record, we hold that there was more than sufficient evidence of Anderson's knowing and willing participation in this conspiracy to uphold the jury's verdict.

II.

Anderson's second legal argument concerns the scope of defense discovery. Prior to trial, Anderson filed a Motion for Discovery and Inspection requesting the right and opportunity to inspect and copy or photograph several "items." Among other requests, he sought access to the following:

3. The recorded testimony of any co-defendant or alleged unindicted co-conspirator before the grand jury which relates to the offense charged in the indictment against the Defendant. Rule 16(a);

. . . . .

5. All books, papers, documents, photographs, tangible objects, buildings or places in the control or possession of the Government which are material to the defense or intended for use by the Government in its case in Chief or any such items obtained from the Defendant. Rule 16(c);

At a hearing on pretrial motions, the government took the position that the request for grand jury testimony in paragraph three was controlled by the Jencks Act but, for the sake of convenience, as the trial progressed the government would provide Jencks Act material at the conclusion of the proceedings on the day before a particular witness was to be called. The government also agreed to comply with the request in paragraph five, quoted above. See Fed.R.Crim.P. 16(a)(1)(c). In return, the defense agreed to comply with the government's request for reciprocal discovery. See Fed.R.Crim.P. 16(b)(1)(A).

Anderson argues that the dismissal of the indictment with prejudice was the only proper sanction available to the district court in this case because the government failed to comply with various discovery re-

---

**2.** The indictment charged a conspiracy that continued from October 8, 1973, to March 31, 1976.

quirements. We have carefully reviewed the record of the procedures followed at trial. We do not find any reversible error.

## A.

■ Initially, Anderson contends that the government did not timely disclose information in Rose's grand jury testimony which suggested that Frank Simpson may have been an unindicted coconspirator involved or implicated in the theft of two Cadillac automobiles. As a prosecution witness, Simpson testified that the two leased Cadillacs had been stolen. Rose, a key member of the conspiracy, testified concerning all phases of the criminal enterprise, including the deals involving the two Cadillacs which were eventually sold to Anderson's co-defendant.

Simpson and Rose were both called as witnesses on the second day of the trial. The government complied with the agreement to provide Jencks Act material for any given witness at the conclusion of the proceedings on the day before a particular witness was to be called and provided defense counsel with Rose's grand jury testimony. Therefore, defense counsel had the Rose grand jury testimony the day before Simpson testified regarding the theft of the two leased Cadillac automobiles. Later in the second day of the trial, Rose's grand jury testimony was introduced as a defense exhibit. Defense counsel used it to support his theory of cross-examination of Rose himself concerning whether the theft of those two leased Cadillac automobiles was really an insurance fraud in which Simpson participated. Thus, the government complied with the discovery agreement and the Jencks Act.

We need not decide whether the Rose grand jury testimony was required to be disclosed under the *Brady* doctrine. Even assuming, for the sake of argument, that the Rose grand jury testimony suggesting Simpson's complicity in the theft of the two leased Cadillacs was *Brady* material, it was, nonetheless, timely provided to defense counsel. It was timely provided for Jencks Act purposes. And, when alleged *Brady* material is contained in Jencks Act material, disclosure is generally timely if the

government complies with the Jencks Act. *See, e. g., United States v. Scott,* 524 F.2d 465 (5th Cir. 1975); *United States v. Wertis,* 505 F.2d 683 (5th Cir. 1974), cert. denied, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975). *Cf. United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1975); *United States v. Fanning,* 477 F.2d 45, 49 (5th Cir.), cert. denied, 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243 (1973).

Since the government timely complied with the disclosure requirements of the discovery agreement, the Jencks Act, and the *Brady* doctrine, we cannot accept Anderson's argument that the district court abused its discretion in denying the defense motion to dismiss the indictment. *See* Fed. R.Crim.P. 16(d)(2).

## B.

After trial, the defense learned that the government had in its possession, at the time Rose testified, an interview report, designated form FD–302 and popularly called a "302," prepared by the Federal Bureau of Investigation agent who interviewed Rose on May 10, 1976. During that interview, Rose, a key prosecution witness and a named coconspirator, had told the FBI agent that a 1974 Ford Ranchero pickup truck had been brought to him by Dickey Lee, who represented to Rose that the truck was owned by Lee's employer, Rocky Dan Riley. During the interview with the agent, Rose explained that Lee had told him Riley wanted the truck stolen and would wait one day before reporting the theft. As a prosecution witness, Riley testified that his Ranchero was stolen.

Anderson argues that the failure to provide the Rose 302 was so serious a violation of the *Brady* doctrine that his conviction must be set aside. The government, initially, suggests that the Rose 302 was not at all significant to the defense because the defense theory denied all involvement with the Ranchero. However, the government cannot convincingly assert the insignificance of the Ranchero based on the defense theory after the government systematically and at great length connected Anderson to

the vehicle. The government also urges that, on the face of the record as a whole, the double hearsay statements of Lee contained in the Rose 302 are not significant. Lee allegedly told Rose that Riley agreed to wait one full day before reporting the Ranchero stolen. In view of the fact that Riley reported his Ranchero stolen that same day, the government contends that it is obvious at least one of the two representations allegedly made by Lee to Rose concerning Riley was false, and this fact does not inspire belief in the second of those representations, namely that Riley actually wanted his truck stolen. From this factual analysis, the government would have us conclude either that the undisclosed 302 was not exculpatory at all or that it was not so obviously exculpatory as to give rise to a constitutional duty to disclose. Finally, the government contends that, even assuming there was a constitutional duty to disclose, the evidence as a whole, so clearly establishing guilt beyond a reasonable doubt, insulates the jury's finding of guilt from an appellate reversal.

Unfortunately, the government here did not heed this Court's recent suggestion: "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Cannon v. Alabama,* 558 F.2d 1211, 1213 (5th Cir. 1977), *quoting, United States v. Agurs, supra,* 427 U.S. at 108, 96 S.Ct. 2392. Of course, this conviction would not have been vulnerable to this attack and our review of the issue had the government produced the 302. *See generally United States v. Wilson,* 578 F.2d 67 (5th Cir. June 15, 1978) (Part III. A.). Since the 302 was not produced, we reach the issue.

In *Brady v. Maryland, supra,* 373 U.S. at 87, 83 S.Ct. at 1196, the Supreme Court concluded: "[t]he suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." This Court, in *Williams v. Dutton,* 400 F.2d 797, 800 (5th Cir. 1968), *cert. denied,* 393 U.S. 1105, 89 S.Ct. 908, 21 L.Ed.2d 799 (1969), observed: "It is now clear that *Brady* imposes an affirmative duty on the prosecution to produce at the appropriate time requested evidence which is materially favorable to the accused either as direct or impeaching evidence." The *Brady* doctrine, the underlying policy of the *Brady* decision, "rests upon an abhorrence of the concealment of material arguing for innocence by one arguing for guilt." *United States v. Ramirez,* 513 F.2d 72, 78 (5th Cir. 1975). This principle of inherent or fundamental fairness has continued to evolve through judicial refinement.

One who seeks to make out a successful *Brady* doctrine claim must establish three factors: (1) the prosecution's suppression of evidence; (2) the favorable character of the suppressed evidence for the defense; (3) the materiality of the suppressed evidence. *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). The judicial emphasis consistently has been placed on the determination of materiality. Assuming that the government suppressed favorable evidence here, our emphasis will be on materiality.

The Supreme Court has recognized three distinct types of situations in which the *Brady* doctrine applies: (1) the prosecutor has not disclosed information despite a specific defense request; (2) the prosecutor has not disclosed information despite a general defense request for all exculpatory information or without any defense request at all; (3) the prosecutor knows or should know that the conviction is based on false evidence. This Court has recently defined a fourth type of situation in which the *Brady* doctrine applies: the prosecutor fails to disclose purely impeaching evidence not concerning a substantive issue, in the absence of a specific defense request. Each type of situation requires the application of a separate analysis and a distinct test for materiality in order to determine whether or not the alleged suppression was so fundamentally unfair as to deny the Due Process right of a fair trial. If the suppressed evidence is found to be material, the conviction cannot stand.

The situation this case presents arguably can be classified as three of the four types of *Brady* doctrine situations. Given

our assumptions, we conclude that Anderson's assertions fail to satisfy the lowest threshold of materiality for a successful *Brady* doctrine challenge. Once we conclude that the lowest threshold has not been met, it necessarily follows that the other two higher thresholds of materiality which arguably apply have likewise not been met, and Anderson's attack on his conviction fails. We hold that the government's suppression of Rose's 302 did not deny Anderson his right to a fair trial mandated by the Due Process Clause of the Fifth Amendment. In order to explicate our application of the lowest threshold of materiality for a successful *Brady* challenge, we briefly describe the four possible types of *Brady* situations and identify the three categories which are arguably applicable here.

■ Recently, this Court recognized a type of situation, distinct from the three types of situations defined by the Supreme Court in *United States v. Agurs, supra,* discussed below. In *Garrison v. Maggio,* 540 F.2d 1271 (5th Cir. 1976), this Court held that before a new trial must be granted because of the prosecutor's failure to disclose purely impeaching evidence not concerning a substantive issue, in the absence of a specific defense request, a defendant must demonstrate that the undisclosed evidence probably would have resulted in an acquittal. *See also United States v. Martin,* 565 F.2d 362 (5th Cir. 1978); *United States v. Beasley,* 550 F.2d 261 (5th Cir. 1977); *United States v. Crockett,* 534 F.2d 589 (5th Cir. 1976); *Calley v. Callaway,* 519 F.2d 184 (5th Cir. 1975) (*en banc*), cert. denied, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). This category includes those cases in which the undisclosed evidence would have had significant impeachment value; such impeachment could concern the witness' interest, motives, prejudices, hostilities, means for obtaining knowledge, power of memory, way of life, associations, and any other pertinent circumstances affecting credibility. *Schneider v. Estelle,* 552 F.2d 593 (5th Cir. 1977); *United States v. Dillon,* 436 F.2d 1093 (5th Cir. 1971). The instant case can be considered to fall within this category, making the highest threshold of materiality, which

requires the most severe showing of harm to the defense, applicable here.

In *United States v. Agurs, supra,* the Supreme Court defined three other distinct types of situations in which the *Brady* doctrine applies.

One category of cases includes the trial situations in which defense counsel has made a specific request for a particular item which was not disclosed. *E. g., Brady v. Maryland, supra.* The Supreme Court has observed: "[a] fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs, supra,* 427 U.S. at 104, 96 S.Ct. at 2398. The case before us does not fall within this category since here there was no specific defense request. The pretrial motion under Rule 16, Fed.R.Crim.P., quoted above, cannot be interpreted to be sufficiently specific to engage this standard of materiality.

■ At most, the Rule 16, Fed.R.Crim.P., motion can be considered a general request for all items "material to the defense." However, it makes no difference if we interpret the motion as a general request for *Brady* material or if we conclude that there was no request for *Brady* material. A third single category of cases encompasses both situations. *E. g., United States v. Agurs, supra; United States v. Jackson,* 536 F.2d 628 (5th Cir.), *on rehearing,* 538 F.2d 95 (1976). When there has been no specific defense request, the failure to disclose information violates due process only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs v. United States, supra,* 427 U.S. at 112, 96 S.Ct. at 2401; *Cannon v. Alabama, supra.* The Supreme Court has explained:

This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of rela-

tively minor importance might be sufficient to create a reasonable doubt.

*United States v. Agurs, supra* at 112–13, 96 S.Ct. at 2402 note omitted).

The instant case could be classified in this category since here there was no specific defense request for the undisclosed material. *See generally Cannon v. Alabama, supra; United States v. Beasley, supra; United States v. Washington,* 550 F.2d 320 (5th Cir. 1977); *United States v. Jackson, supra.*

█ A fourth category includes cases in which the undisclosed information indicates that the conviction is based on false evidence or perjured testimony which the prosecution knew or should have known was false. Such a conviction is fundamentally unfair and must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs, supra,* 427 U.S. at 103, 96 S.Ct. at 2391. Of the four standards for measuring the materiality of the undisclosed evidence, this "reasonable likelihood" standard is the lowest threshold for reversal. That is, the defendant's burden of showing the materiality of the suppressed evidence, a showing which requires reversal, is the least onerous of the four type situations. Given the assumptions we make to decide this appeal, we will analyze the facts and evidence in the instant case under this standard.

█ The long-settled rule has been that the knowing[3] use by the prosecution of false evidence or perjured testimony[4] which is material to the issues in a criminal trial is a denial of due process. A conviction obtained by the use of such evidence cannot be permitted to stand. *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). *See also Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *White v. Ragen,* 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348 (1945); *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1947); *Hysler v. Florida,* 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932 (1942). The same rule applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression. *Napue v. Illinois, supra; Alcorta v. Texas, supra. See Hamric v. Bailey,* 386 F.2d 390 (4th Cir. 1967); *Link v. United States,* 352 F.2d 207 (8th Cir. 1965). The same result may obtain even though the false nature of the evidence concerns only the credibility of an important witness, rather than the ultimate issue of guilt or innocence. *Brady v. Maryland, supra; William v. Dutton, supra.*

█ While the knowing use of perjured testimony may require reversal even though the falseness of the testimony relates only to a prosecution witness' credibility, this does not mean that the suppression of evidence tending to impeach *any* prosecution witness would be so material as to require reversal merely because the evidence itself was material to *that* witness' testimony. Materiality must be evaluated in light of all the evidence. The rule of

---

**3.** In *United States v. Anderson,* 165 U.S.App. D.C. 390, 405, 509 F.2d 312, 327 (1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975), the court suggested "[t]here is respectable authority for the proposition that a new-trial motion on the ground of false testimony, even without a claim that the prosecutor knew of the falsity, should under some conditions be granted," citing *Newman v. United States,* 238 F.2d 861, 862 n. 1 (5th Cir. 1956). Given our assumptions and reasoning, we need not consider the "knowledge" issue. *See* Note, *The Duty of the Prosecutor to Disclose Exculpatory Evidence,* 60 Col.L.Rev. 858, 861–65 (1960). *See generally* Note, *The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant,* 74 Yale L.J. 136 (1964); Comment, *Materiality and Defense Requests: Aids in Defining the Prosecutor's Duty of Disclosure,* 59 Iowa L.Rev. 433 (1973); Comment, *Brady v. Maryland and the Prosecutor's Duty to Disclose,* 40 U.Chi.L.Rev. 112 (1972).

**4.** Given our assumptions and reasoning, we need not decide if the alleged inconsistencies here established perjury. *See Luna v. Beto,* 395 F.2d 35 (5th Cir. 1968) (*en banc*), *cert. denied,* 394 U.S. 966, 89 S.Ct. 1310, 22 L.Ed.2d 568 (1969); *United States v. Jakalaski,* 237 F.2d 503 (7th Cir. 1956).

*Mooney v. Holohan, supra,* has been extended to situations in which the suppressed evidence goes to the credibility of a prosecution witness only when the "estimate of the truthfulness and reliability of [the] given witness may well be determinative of guilt or innocence." *Napue v. Illinois, supra,* 360 U.S. at 269, 79 S.Ct. at 1177, *quoted in Giglio v. United States, supra,* 405 U.S. at 154, 92 S.Ct. 763. *See also United States v. Crockett, supra; Calley v. Callaway, supra; Davis v. Heyd,* 479 F.2d 446 (5th Cir. 1973); *Wiman v. Powell,* 293 F.2d 605 (5th Cir. 1961). The reviewing court must focus on the impact on the jury. A new trial is necessary when there is any reasonable likelihood that disclosure of the truth would have affected the judgment of the jury, that is, when there is a reasonable likelihood its verdict might have been different. We must assess both the weight of the independent evidence of guilt and the importance of the witness' testimony, which credibility affects. *United States v. Sutton,* 542 F.2d 1239 (4th Cir. 1976); *Boone v. Paderick,* 541 F.2d 447 (4th Cir. 1976). *But see United States v. Butler,* 567 F.2d 885 (9th Cir. 1978).

We assume, only for the purpose of this discussion, that here the prosecutor knowingly allowed Riley to testify falsely that his car was stolen when, according to the Rose 302, he had himself arranged the theft through Lee. Even given this extreme an assumed scenario, we cannot conclude that Anderson was denied the fair trial guaranteed him by the Due Process Clause of the Fifth Amendment.

The indictment here charged Anderson with knowing and willing participation in a conspiracy to deal in stolen cars. As we have observed, the conspiracy, the existence of the illicit agreement and the commission of various overt acts by several participants, was clearly proven. We have already held that Anderson's knowing and willing participation was clearly proven. Here there was strong, independent evidence of guilt.

Riley's testimony was not so important as to require reversal. Anderson's counsel has admitted that Riley was treated as merely a "technical witness" who testified that the Ranchero was stolen. We cannot agree that Rose's 302 account of Lee's version of Riley's connivance, even assuming it was admissible, *see* Fed.R.Evid. 613, 801(d)(2)(E), made Riley's testimony or his credibility so important as to require reversal here. The Ranchero was mentioned in the indictment regarding two overt acts. Among the twenty-three overt acts listed, the indictment alleged the theft of the Ranchero by an unidentified coconspirator and Anderson's receipt of the Ranchero from Rose followed by his disposing of it to Arlies Guy East, an indicted, named coconspirator. Had the charge been a substantive violation of the Dyer Act, and the overt acts separate counts upon which a jury found Anderson guilty, we would likely reach a different result under our assumed facts. Here, however, we emphasize again that the indictment charged knowing and willing participation in a conspiracy. The testimony of Riley was simply not that important in the context of this conspiracy trial. Whether or not Riley was an unindicted coconspirator who arranged for the theft of his own car was not significant to the issue before the jury which was whether Anderson knowingly participated in the conspiracy.

We must, therefore, hold that even if the jury had known of the Rose's 302 account of Lee's version of Riley's connivance there was no reasonable likelihood that the verdict might have been different. Once we have concluded that the challenged suppression fails to satisfy the lowest *Brady* doctrine threshold for materiality and reversal, it necessarily follows that the application of higher thresholds, which require greater showings of materiality in order to gain a reversal, cannot aid Anderson in his cause. Therefore, we need not apply the other standards which are arguably applicable here.

### C.

 Anderson also asserts as error the failure of the government to disclose a written statement by the witness Riley to the CID at Fort Benning, Georgia, on February

17, 1976. Even though the prosecution failed to comply with its agreement and did not disclose the statement on the evening before Riley testified, without complaint by defense counsel, the existence of the statement was certainly brought to defense counsel's attention during the direct examination of the witness. The document was handed to Riley to refresh his memory. The defense neither objected nor specifically requested a copy. The statement itself would have had no value to the defense even for impeachment, since it corroborated Riley's direct testimony. Thus, any error in the failure to disclose the statement under the Jencks Act would be, at most, harmless. *See Goldberg v. United States,* 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976); *Calley v. Callaway, supra.* Likewise, any possible Jencks Act error regarding the Rose 302 could only be harmless. *United States v. Graves,* 428 F.2d 196 (5th Cir.), *cert. denied,* 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970). *Cf. United States v. Judon,* 567 F.2d 1289 (5th Cir. 1978); *United States v. Martin,* 565 F.2d 362 (5th Cir. 1978); *United States v. Hodges,* 556 F.2d 366 (5th Cir. 1977).

AFFIRMED.