[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10170

_____

D.C. Docket No. 1:09-cr-00040-JRH-WLB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALEX RODGER, III,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(June 6, 2013)

Before CARNES and WILSON, Circuit Judges, and HUCK,[*] District Judge.

PER CURIAM:

_____

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

Alex Rodger, III appeals his jury convictions for armed robbery of a bank, in violation of 18 U.S.C. § 2113(a) and (d), and for carrying, using, and brandishing a firearm during that robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  He contends that the district court erred in denying his motion to suppress evidence seized after he was stopped at a police roadblock and his motion to suppress out-of-court witness identifications.  He also challenges the district court's refusal to issue a subpoena for an unnamed witness, its refusal to allow him to introduce a video recording from a bank surveillance camera, and its refusal to disclose the contents of a note from the jury.  In addition, he maintains that he is entitled to a new trial based on a deficiency in the trial transcript.

I.

In February 2009 the Bank of America in Richmond County, Georgia was robbed.  Latoya Johnson, the victim teller, described the robber as an African-American man in his 50s or 60s with freckles who was wearing a blue jacket trimmed in red, a black shirt, a skull cap, and sunglasses.  He was armed with a handgun.  The robbery was captured by a surveillance camera located above the teller station.

Johnson gave the robber "bait money," which contained an electronic tracking device that sent a signal to the 911 call center.  Based on the signal sent out from the bait money, the Richmond County Sheriff's Office determined that

2

the stolen money was traveling westbound on Interstate 20 towards Columbia County. The sheriff's office coordinated with officers in Columbia County to slow down traffic in the westbound lane of I-20 and see if any of the vehicle occupants matched the description of the suspect. Because one of the officers was given an incorrect description of the robber, however, the suspect was not stopped in Columbia County and proceeded toward McDuffie County while traveling at speeds over 100 miles per hour.

The Richmond County Sheriff's Office then set up a roadblock in McDuffie County. Richmond County Sheriff's Deputy Rachel Hardin was observing traffic flowing through that roadblock when Rodger pulled up. Because Rodger matched the description of the robber, Hardin asked him to step out of his vehicle so that she could pat him down for weapons. He complied without objection. Hardin asked Rodger if she could look in the trunk of his car. He said "Sure," and opened the trunk using his key fob.

Once the trunk was open, Hardin observed a blue jacket that fit the witness descriptions she was given. Hardin asked Rodger if she could search the trunk further but he refused and, according to Hardin, he then "lung[ed] toward the jacket" and yelled "No." Hardin stopped the search and asked another officer to watch Rodger so that she could call an FBI agent to come to the scene and verify that Rodger was the bank robber. Before she was able to make the call, an FBI

agent arrived and identified Rodger as the bank robber based on a surveillance photograph from the robbery.  Deputy Hardin then arrested Rodger.  After that, another officer arrived with a handheld receiver that was being used to track the bait money.  As the officer approached Rodger's vehicle, the beeping sound from the receiver became more frequent, and once he was standing next to the trunk of Rodger's vehicle, the beeping sound became constant, signifying that the bait money was close by.

After Rodger was arrested, police officers removed the blue jacket from the trunk of his car.  In its pockets the officers found a handgun, $6,304 in cash, and the bait money.  The gun, which was loaded, matched the description of the one used in the robbery.

Deputy Hardin took Rodger back to the bank and three bank employees— Latoya Johnson, Gloria Ivory, a teller who observed the robbery, and Douglas Graves, a bank employee who had gotten a good look at the robber—were asked to participate in a show-up identification.  The employees were taken to an enclosed foyer and were told that they could not communicate with each other until the show-up was over.  Then, one at a time, the employees looked at Rodger through a glass window on the upper part of the door facing the parking lot.  Rodger was standing in front of Hardin's patrol car with his hands handcuffed behind his back, and he was flanked on either side by Deputy Hardin and another officer.  When

4

Johnson was asked whether she recognized anyone standing outside the bank, she identified Rodger as the man who had robbed her.  Graves was also asked whether he recognized anyone outside the bank, and he identified Rodger as the person who robbed the bank.  Ivory later testified that at the show-up she was not able to identify Rodger as the person who had robbed the bank because he was not wearing the jacket, hat, or sunglasses worn by the robber.

After his indictment Rodger was granted permission to proceed pro se, although standby counsel was appointed for him.  Rodger filed a pretrial motion to suppress evidence seized from his car, arguing that the stop of his vehicle, the seizure of his person, and his arrest were all in violation of the Fourth Amendment. He also moved to suppress the out-of-court identifications of the bank employees, arguing that the show-up was impermissibly suggestive.  A magistrate judge recommended that the district court deny Rodger's motions,  and the district court adopted the magistrate judge's report and recommendation.

Before trial Rodger filed an ex parte application under Federal Rule of Criminal Procedure 17(b) to subpoena as a witness an unnamed Columbia County Sheriff's Deputy who allegedly wore badge number 92940.  He also asked the court to subpoena Sharon Kline, a bank manager, and require her to bring to trial the "proof work" from Johnson's cash drawer, which Rodger claimed would show a discrepancy between the amount of money stolen from the drawer and the

5

amount of money returned to the bank from his car.  The district court denied

Rodger's request to subpoena the unnamed Columbia County Sheriff's Deputy.

The court did issue a subpoena to Kline, but it denied Rodger's request to require

Kline to bring to court the proof work from Johnson's drawer on the day of the

robbery.

The jury found Rodger guilty of armed bank robbery and carrying, using,

and brandishing a firearm during a crime of violence.  Before it reached that

verdict, the jury asked the court a question, which was resolved without objection.

The jury also asked a second question but then, because it had reached a verdict,

withdrew that question before the court could answer it.  After the verdict Rodger

filed an ex parte motion asking the court to provide him with the second question

the jury had asked.  Rodger also filed two other motions asking the court to

provide him with the second jury question.  The district court denied all of those

motions.

Rodger also filed a motion under Federal Rule of Appellate Procedure 10(e)

asking the court to make corrections to the trial transcript, arguing that the trial

transcript did not include "what was said [] in court by the bailiff and/or Marshals

relative to the jurors['] second question . . . ."  The court entered into the record a

detailed description of the circumstances surrounding the submission of the second

jury question and denied as moot Rodger's motion asking the court to make corrections to the trial transcript.

After Rodger appealed his conviction, he filed a notice with this Court indicating that he wished to proceed pro se on appeal. We sua sponte appointed appellate counsel, although we permitted Rodger to file an appellate brief in addition to the brief filed by his appointed counsel.

Before briefing, Rodger's newly-appointed counsel filed a motion asking this Court to direct the district court to unseal the second jury question, and the government did not oppose that motion. We construed Rodger's motion as a motion to supplement the record, and directed the district court to do so. The district court complied but it instructed the Clerk of the Court to docket the question under seal. The government then filed a motion with the district court asking it to unseal the question. The court denied that motion, concluding that "because the jury explicitly stated that the second [question] should be disregarded in light of the verdict," the court "was not required to reveal the contents of the note to the parties."

II.

Rodger contends that the district court erred in denying his motion to suppress the evidence seized as a result of the roadblock.[1]  He asserts that the roadblock was not "programmatically implemented pursuant to . . . Constitutional Standards."  When the district court denies a motion to suppress, we review for clear error its findings of fact, and we review de novo its application of the law to those facts.  United States v. King, 509 F.3d 1338, 1341 (11th Cir. 2007).

A vehicle stop at a highway checkpoint is a seizure within the meaning of the Fourth Amendment, which requires that searches and seizures be reasonable.  City of Indianapolis v. Edmond, 531 U.S. 32, 37, 40, 121 S.Ct. 447, 451, 453 (2000).  "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."  Id. at 37, 121 S.Ct. at 451.  In Edmond, the Supreme Court held that a roadblock set up for the primary purpose of detecting "evidence of ordinary criminal wrongdoing" was unconstitutional.  Id. at 41–44, 121 S.Ct. at 454–56.  The Court also noted, however, that there are "circumstances that may justify a law enforcement checkpoint where the primary purpose would otherwise, but for some emergency, relate to ordinary crime control."  Id. at 44, 121 S.Ct. at 455.  "For example . . . the Fourth Amendment

---

[1] Rodger first asserts that the district court made "no findings of fact" and "no legal conclusions" about his claim that "he and his vehicle were unlawfully stopped."  That assertion is wrong.  The magistrate judge, in his report and recommendation, considered and rejected Rodger's argument that the roadblock was unconstitutional.  The district court, under a de novo standard of review, then considered Rodger's objections to the report and recommendation and adopted it.

would almost certainly permit an appropriately tailored roadblock set up . . . to catch a dangerous criminal who is likely to flee by way of a particular route." Id.

Here, the robbery suspect was a dangerous criminal who was armed and had been travelling at speeds of over 100 miles per hour. The roadblock was appropriately tailored to protect the state's interest in capturing an armed and dangerous criminal while minimizing the intrusion on drivers' privacy. The officers constructed the roadblock in the robber's known path, as indicated by the tracking device on the bait money, and they screened vehicles, stopping a person only if he matched the description of the robber.

Rodger contends that Deputy Hardin violated the Fourth Amendment because she did not have reasonable suspicion to stop him. We disagree. Deputy Hardin had reasonable suspicion to stop Rodger because he matched the description of the robber given to her by dispatch. See United States v. Allison, 616 F.2d 779, 782 (11th Cir. 1980) (concluding that reasonable suspicion may exist "on the collective knowledge of the police when there is reliable communication between the officer supplying the information and the officer acting on that information"). That suspicion ripened into probable cause to arrest when Deputy Hardin saw the blue jacket matching the description of the one worn by the robber in Rodger's trunk, and the FBI agent identified Rodger as the suspect based on a surveillance photo. Rodger's reaction to Hardin's request to further

9

search the trunk also supports the conclusion that there was probable cause to arrest him. See Feliciano v. City of Miami Beach, 707 F.3d 1244, 1251 (11th Cir. 2013) ("Probable cause to arrest exists when the facts and circumstances within an officer's knowledge are sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime . . . .") (quotation marks omitted). [2]

Rodger also argued for the first time in a motion for a new trial that the evidence from his car should have been suppressed because Deputy Hardin, as a sheriff's deputy in Richmond County, lacked the authority to arrest him in McDuffie County. A party's failure to present a motion to suppress evidence before trial constitutes a waiver "unless the district court grants relief for good cause shown." United States v. Ford, 34 F.3d 992, 994 n.2 (11th Cir. 1994). In his motion for a new trial, Rodger claimed that his argument that Hardin was outside of her jurisdiction was based on "newly available evidence." The district court rejected that argument, concluding that Rodger failed "to explain in any coherent way how the evidence could possibly be considered to have been discovered after trial." We agree. In one of Rodger's pretrial motions to suppress evidence, he acknowledged that Hardin was a "Richmond County Deputy," and that he was

---

[2] Rodger also contends that the evidence should be suppressed because Deputy Hardin was alone when she stopped him in McDuffie County and that she gave "perjured" testimony to the contrary. The magistrate judge's report and recommendation, which was adopted by the district court, concluded that there was a roadblock in McDuffie County, contrary to Rodger's assertion that Hardin was acting alone. That fact finding is supported by the testimony of officers who were present at that roadblock and is not clearly erroneous.

10

arrested in McDuffie County. Accordingly, the record shows that Rodger's argument was not based on newly available evidence. Rodger therefore has not shown good cause for relief from the waiver doctrine.[3]

### III.

Rodger contends that the district court erred in denying his motion to suppress the out-of-court identifications by Johnson and Graves. We review the constitutionality of an out-of-court identification under a two-part test. United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001). "First, we must determine whether the original identification procedure was unduly suggestive. If we conclude that it was suggestive, we then must consider whether, under the totality of the circumstances, the identification was nonetheless reliable." Id. To decide whether the identification was nonetheless reliable, we consider the following factors: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' earlier description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. United States v. Douglas, 489 F.3d 1117, 1126 (11th Cir. 2007).

---

[3] Setting aside the waiver issue, Rodger's argument is meritless. Rodger argues that Deputy Hardin violated Georgia law by making an arrest outside of her jurisdiction. But even if the arrest did violate Georgia law, that is irrelevant for purposes of the Fourth Amendment as long as the arrest was supported by probable cause, and it was. See Virginia v. Moore, 553 U.S. 164, 176, 128 S.Ct. 1598, 1607 (2008).

Without implying that the show-up identification might be unnecessarily suggestive, we decline to address that issue because it is unnecessary to do so. Even assuming for present purposes undue suggestiveness, the identification was still reliable. Both eyewitnesses who identified Rodger as the robber had ample opportunity to view him during the crime. Graves testified at the suppression hearing that he got a "really good look" at the robber because his desk was facing the teller line, about 10 or 20 feet away from where the robber stood in line waiting for Johnson to finish helping another customer. Johnson testified that the robber approached her teller station and stood one or two feet away from her. He then pulled out a gun, held it up against his chest, and said, "Do you see this?" Johnson replied, "Yes, sir," and the robber said, "Give me all your money." Johnson gave the robber all of the money in her cash drawer except the bait money. The robber then said, "Didn't I tell you to give me everything?" Pointing to the bait money, Johnson asked "Do you want this too?" The robber repeated, "I said give me everything." Johnson complied and gave the robber the bait money. He then asked Johnson where the bathroom was, and she told him it was "in the back." The robber instructed Johnson to go to the bathroom without looking at or speaking to anyone, after which he walked out of the bank. Because the robber gave her so many commands, Johnson had plenty of time to observe his

12

appearance and the sound of his voice.  At the suppression hearing, she not only identified Rodger as the robber by his looks but also by the sound of his voice.

Both eyewitnesses also paid close attention to the robber.  Graves testified that the robber "caught his attention" because he entered the bank wearing a jacket and skull cap, even though it was an "abnormally warm day."  And Johnson obviously paid attention to him because he was robbing her at gunpoint and issuing a series of instructions to her.  As the magistrate judge noted at the suppression hearing, "her degree of attention could not [have been] any stronger."

Both eyewitnesses accurately described the robber.  Johnson and Graves told the investigating officers that he was an African-American male, was armed with a handgun, and was wearing a dark coat with red trim, a skull cap, and sunglasses. When Rodger was captured less than 2 hours after the robbery, police officers found in his car a handgun, a blue jacket trimmed in red, a skull cap, and sunglasses.  Johnson and Graves were also certain in their identifications.  Johnson identified Rodger as the robber "almost immediately" after he got out of the police car, and she testified at the suppression hearing that she was "certain" that Rodger was the robber.  Graves also testified that he had "no doubt" that Rodger was the person who robbed the bank.  Finally, the identification happened less than two hours after the robbery, while the witnesses' memories were still fresh.

13

In any event, any error in admitting the out-of-court identifications would be harmless given the strength of the other evidence against Rodger. Within two hours of fleeing the scene of the robbery Rodger was captured, and at that time he was in possession of a jacket that matched the description of the one worn by the robber, a handgun, $6000 in cash, and the bait money, which the robber had taken from the bank. Johnson also testified at the suppression hearing that she recognized Rodger as the robber based on the sound of his voice, which the magistrate judge later noted was "a very distinctive voice which is the type of voice that anyone would tend to remember." And if that weren't enough, the surveillance video also showed Rodger robbing the bank.

## IV.

Rodger contends that the district court abused its discretion in denying his motion to subpoena an unnamed sheriff's deputy who allegedly wore badge number 92940. Federal Rule of Criminal Procedure 17(b) allows an indigent defendant to obtain the testimony of "a named witness" if he shows both "an inability to pay the witness's fees" and "the necessity of the witness's presence for an adequate defense." Fed. R. Crim. P. 17(b). We review only for an abuse of

discretion the district court's decision to deny a request for a subpoena under Rule 17. United States v. Hegwood, 562 F.2d 946, 952–53 (5th Cir. 1977).[4]

The district court did not abuse its discretion in denying Rodger's request to subpoena the unnamed deputy under Rule 17(b). Rule 17(b) provides for the issuance of a subpoena for a "named witness." That rule "is clearly not a discovery device." Id. at 952. Rodger asserts that the government and the district court should have assisted him in determining the name of the deputy. The government, however, is not obliged to "identify defense witnesses." United States v. Griggs, 713 F.2d 672, 673 (11th Cir. 1983). Rodger even conceded during an evidentiary hearing that the government had provided him with copies of all the evidence in its files. Rodger also agreed with the district court that it was not the role of the United States Marshals Service to be his investigator.

Rodger further contends that the district court abused its discretion in denying his request that Sharon Kline be required to bring to trial the proof work from Johnson's cash drawer on the day of the robbery. He argues that those documents would have shown a discrepancy between the amount stolen from the bank and the amount that was found in his car and returned to the bank. At trial, however, Kline testified that when the stolen money was returned, it was about

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

$6,000 less than the amount Johnson had reported stolen from her teller drawer. So, the district court did not abuse its discretion in denying Rodger's request.

## V.

Rodger contends that the district court abused its discretion when it refused to allow him to introduce a surveillance videotape. At trial, the government introduced a redacted copy of a surveillance videotape containing a one-minute recording of still photographs that showed Rodger robbing a bank teller. Rodger did not object to the admission of that recording. Later in the trial, Douglas Graves testified that he saw the robber when he entered the bank. During his cross-examination of Graves, Rodger tried to introduce a longer version of the surveillance video given to him by the government during discovery, which showed images a few minutes before the robbery. Rodger claimed that his "unredacted" video would show that Graves could not actually have seen the robber because he was with a customer at that time. The government objected on the ground that there was no foundation for admitting the recording. The court sustained that objection, telling Rodger that he must "lay a foundation for getting the video recording into evidence." Rodger said "Okay. We'll do it later." The court then said, "Mr. Rodger, you have standby counsel. If you need to consult with him on any of these issues of evidence, that's why he's here." Rodger consulted with standby counsel, but he did not try to lay a foundation for the

16

recording after that. Rodger had an opportunity to lay a foundation for admitting the recording, but he did not take advantage of it. There was no error.[5]

Rodger also contends that the prosecutor "engaged in misconduct" by introducing the redacted surveillance video, which Rodger claims was redacted to cover up perjured testimony by Graves. Neither the Federal Rules of Evidence nor our precedent supports Rodger's assertion that the government was required to introduce the entire surveillance recording just because it had given Rodger an unredacted version of that recording during discovery. There is also nothing in the record that would suggest that the recording was redacted in order to cover up perjured testimony.

Rodger further contends that Graves falsely testified that he saw the robber entering the bank, and that the prosecutor engaged in misconduct by knowingly using that "perjured" testimony. To obtain a reversal on the ground that the government relied on perjured testimony, Rodger must show that: (1) the contested statements were actually false, (2) the statements were material, and (3) the prosecution knew that they were false. United States v. Bailey, 123 F.3d 1381, 1395 (11th Cir. 1997). Even if Graves' statement was false, the statement was not

---

[5] Rodger further argues that the district court violated his rights under the Confrontation Clause by "mechanistically" applying Federal Rule of Evidence 901(a) to exclude the surveillance recording. A defendant does not have a right under the Confrontation Clause to use whatever evidence he wants without regard to the rules of evidence. See Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435 (2008) (noting that "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish").

17

material.  Materiality is "evaluated in light of all the evidence."  United States v. Anderson, 574 F.2d 1347, 1355 (5th Cir. 1978).  When there is "strong, independent evidence of guilt," and where the crimes were "clearly proven" apart from the purportedly perjured testimony, any alleged falsehood is not material.  Id. at 1356.  There was strong independent evidence of Rodger's guilt:  Johnson, the teller who was robbed, identified Rodger as the man who robbed her; the surveillance video showed Rodger robbing the bank; and Roger was caught red-handed fleeing with the bait money less than two hours after the robbery.  Rodger has also presented nothing other than his own conclusory statements to support his assertion that Graves' testimony was false and the prosecutor knew it.

VI.

Rodger contends that he is entitled to a new trial because the trial transcript does not say anything about the second jury question.  But "a defendant is not automatically entitled to a new trial every time there is an omission from the transcript."  United States v. Preciado-Cordobas, 981 F.2d 1206, 1212 (11th Cir. 1993).  If the defendant is represented on appeal by an attorney who did not participate in the trial, which is the case here, a new trial is necessary "if there is a substantial and significant omission from the trial transcript."  Id.  "Whether there is a substantial and significant omission can be decided only after the district court

18

has attempted to reconstruct those portions missing from the transcript." Id.

(emphasis added).

> The district court in this case did reconstruct the record, as it explained:

> During its deliberations, the jury submitted two questions to the Court.
> . . . The officer submitted the [first] question to the [Court, which] contacted both Defendant and the Government and asked them to reconvene in the courtroom. Subsequently, the parties appeared before the Court and agreed upon an appropriate response, which the Court then submitted to the jury.
> Approximately forty minutes after the initial question and the response, the jury notified courtroom security that it had another question. The Court followed the same procedure as before; upon receiving the question, the Court immediately informed the parties of the question's existence and ordered the parties to promptly convene in the courtroom to discuss the matter. In only a few minutes, all parties were present in the courtroom. However, this time, once the parties had assembled in the courtroom, the jury informed court security that the second question should be disregarded and that it had reached a verdict. The Court abided by the will of the jury and proceeded directly to the reading of the verdict without objection from either party.

Rodger argues that the reconstructed record is insufficient because the judge "recreated the circumstances from his memory," "five months after the events in question." However, absent a showing of intentional falsification or unreasonableness, the reconstructed record as determined by the district court is conclusive. United States v. Mori, 444 F.2d 240, 246 (5th Cir. 1971). Rodger has not shown either intentional falsification or unreasonableness. He attached a personal affidavit to the brief filed by his appellate counsel, in which he takes issue with the court's statement that the "jury informed court security that the second

19

question should be disregarded." Rodger is not entitled to supplement the record by attaching his own affidavit to his appellate attorney's brief. See Hoover v. Blue Cross and Blue Shield of Ala., 855 F.2d 1538, 1543 n.5 (11th Cir. 1988). Because the district court was able to reconstruct the record, there are no "substantial and significant omissions" from the record warranting a new trial. See Preciado-Cordobas, 981 F.2d at 1213.

Rodger also contends that the district court erred by refusing to disclose to him the contents of the jury's second question. That argument is foreclosed by our decision in United States v. Rodriguez, 765 F.2d 1546, 1554 (11th Cir. 1985), which held that there was "no prejudicial error in the [district] court's refusal to answer the [jury's] question or disclose it to defense counsel" when "the verdict had already been reached." The court reasoned that "[a]nswering the question at that point would have been futile." Id.

Rodger argues that this case is distinguishable from Rodriguez because in this case, unlike in Rodriguez, it is impossible to know whether the district court acted promptly in notifying the parties of the question. We disagree. The reconstructed record shows that the court did act promptly in trying to answer the question, but the jury reached a verdict before the question could be answered. The district court did not err in refusing to disclose the jury's second question.

**AFFIRMED.**