**Charles William CANNON, Petitioner-Appellant,**

v.

**STATE OF ALABAMA, Respondent-Appellee.**

No. 76–2118.

United States Court of Appeals, Fifth Circuit.

Sept. 12, 1977.

---

Robert R. Bryan, Birmingham, Ala. (Court-appointed), Leon St. John, West Palm Beach, Fla., for petitioner-appellant.

William J. Baxley, Atty. Gen., Birmingham, Ala., Randolph P. Reaves, Asst. Atty. Gen., Montgomery, Ala., Barry V. Hutner, Asst. Attys. Gen., Birmingham, Ala., for respondent-appellee.

Before GOLDBERG, SIMPSON and FAY, Circuit Judges.

GOLDBERG, Circuit Judge:

In a Birmingham service station on the night of May 31, 1972, a black customer shot and killed the manager, son of the city's deputy police chief. The state of Alabama charged Charles William Cannon with murder in connection with that shooting. The sole issue at trial was the identity of the assailant. The state presented one eyewitness who identified Cannon as the killer and another eyewitness who placed Cannon at the scene just prior to the event. Cannon impeached the testimony of those two witnesses and presented extensive alibi evidence. A jury found him guilty of second-degree murder and fixed his sentence at twenty-three years imprisonment. The court entered judgment accordingly.

Cannon now comes before us alleging that the state committed two constitutional errors affecting the determination of guilt or innocence. We agree. The first was the prosecutor's failure to disclose to the defense the existence of an eyewitness who would positively identify the assailant as someone other than Cannon. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Because the state's evidence was already very weak, the undisclosed eyewitness testimony would have created a reasonable doubt of Cannon's guilt. The second constitutional error was the staging of a post-indictment showup at which Cannon's counsel was not present. *See United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The state did not establish that the witness's in-court identification of Cannon derived from a source independent of the impermissible showup. Indeed, the record demonstrates the contrary.

Either of these errors, standing alone, would invalidate Cannon's conviction. We reverse the district court's denial of habeas relief.[1]

I.

The Supreme Court has recently dealt at some length with a prosecutor's duty to disclose to the defense exculpatory information. *See United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Emphasizing that "the prudent prosecutor will resolve doubtful questions in favor of disclosure," 427 U.S. at 108, 96 S.Ct. at 2399, 49 L.Ed.2d at 352, the Court held that failure to disclose information for which there has been no specific request violates due process only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." 427 U.S. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 355.[2] Apply-

---

1. The district court adjudicated the case on the basis of the state trial record and the transcript of the state court hearing on Cannon's new trial motion. Cannon has exhausted his state remedies.

2. Whether a prosecutor must disclose a particular item depends upon whether it is "materi-

al." The standard for judging materiality differs among three categories. The first encompasses cases in which the undisclosed information indicates that the prosecution's case includes perjured testimony, as the prosecutor knew or should have known. *See, e. g., Moo-*

ing this standard requires an analysis of the evidence adduced at trial and of the probable impact of the undisclosed information. In this context we cannot merely consider the evidence in the light most favorable to the government but must instead evaluate all the evidence as it would bear on the deliberations of a factfinder.

Our careful review of the record indicates that, even without the testimony of the undisclosed eyewitness, evidence of Cannon's guilt was extremely weak. Evidence linking Cannon to the shooting came from but two witnesses, only one of whom testified during the prosecution's case in chief. That witness was Samuel Wheeler, an attendant at the gas station and an eyewitness to the crime. His testimony apparently tracks the state's theory of the case.

The substance of that testimony follows. Wheeler, a sixteen-year-old student, was working at Birmingham's Crystal Service Station on the afternoon of May 31, 1972. Jack Warren, Jr., the victim, was in charge of the station.[3] Warren had been in the station drinking beer for nearly two hours when two black men in an old beige Dodge pulled up to one of the pumps. Wheeler identified the driver as Josh Stephens and the passenger as Cannon. Wheeler pumped two dollars worth of gas and received payment from the driver. The passenger went into the station building. Apparently upon a delay in removing the car from the pump area,[4] Warren brusquely told the passenger to move the car and to leave the office. The passenger left the office after disclaiming ownership of the car or authority to move it.

Warren told Wheeler that the passenger had been "trying to get smart." Warren picked up a gun off a storage room shelf and put it in his pocket. Apparently upon hearing the earlier remark, the passenger came back inside. Warren repeated his instruction to move the car, and the passenger repeated his statement that he could not do so. Warren pulled the gun from his pocket. The passenger overpowered Warren, took the gun, and shot and killed Warren.

The defense challenged no part of Wheeler's testimony except his identifications of the driver and the passenger. The attack on Wheeler's credibility regarding that testimony was telling. Wheeler admitted making statements to several persons disavowing knowledge of who had committed the crime. Immediately after the shooting Wheeler told the police, a newspaper reporter, and his own mother that he could not identify the assailant. Because Wheeler concededly knew Cannon, those earlier statements directly contradicted Wheeler's trial testimony. In addition, Wheeler first identified Cannon four weeks after the shooting. During that four-week period, police concededly took Wheeler to City Hall three or four times and talked with him on at least ten or fifteen other occasions, constantly urging him to implicate Cannon. Perhaps most significantly, Wheeler testified that a detective told him that he would go to jail if he failed to identify Cannon as the assailant.[5] Throughout the four-week period, Wheeler denied Cannon's involvement.

The defense thus left Wheeler's testimony badly impaired. The only additional witnesses in the prosecution's case in chief were the victim's father (who testified to

*ney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). The second category comprises cases in which defense counsel has made a specific request for a particular item. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The third category includes cases in which defense counsel has made no request or only a general request for all "exculpatory material." *See United States v. Agurs, supra.* The case at bar falls into this third category.  .

3. Warren, who was "visiting" the station and may have had no formal connection with it, was in charge while the owner went for sandwiches.

4. The defense presented testimony that the delay resulted from a dead battery, that the driver summoned help from a nearby garage, and that the garage operator managed to start the car.

5. The record does not indicate why the police originally focused their investigation on Cannon.

the undisputed identity of the victim), the deputy coroner (whose testimony included nothing of relevance here), and a police sergeant (who denied threatening Wheeler but admitted questioning Wheeler perhaps more than twenty times in the weeks prior to Wheeler's identification of Cannon). The state had brought forth only one witness linking Cannon to the crime. That witness testified that he had identified Cannon after four weeks of taking a contrary position and after the police threatened to jail him if he did not make the identification.

In response to the already weak government showing, the defense presented extensive evidence. Cannon testified that he had been playing the card game "whist" at the time of the shooting. No fewer than thirteen witnesses corroborated that story. In addition, five separate witnesses testified that they had been at the service station shortly before the shooting, observed the two men in the beige car, and knew that neither of those men was Cannon.[6] All of these witnesses, then, provided testimony directly contradicting that of the state's sole substantive witness to that point, Samuel Wheeler. Moreover, the defense presented testimony that Wheeler had a bad reputation for truthfulness.[7]

On rebuttal the prosecution produced a second witness linking Cannon to the shooting. Eleanor Ann Adaway had been in the station shortly before the shooting and had seen the beige car. Unlike *every* other witness who had seen the car, Adaway testified that it carried three, not two men. Like Samuel Wheeler, she identified the driver as Josh Stephens. She said she had not seen the front-seat passenger's face and

could not identify him. She testified that the third person, sitting in the back seat, was Cannon.

The defense succeeded in casting considerable doubt on Adaway's testimony. First, her account was inconsistent with that of every other witness; she alone had placed Cannon in the car's rear seat or indicated there were three passengers. Second, she had been unable to recognize Cannon's photograph shortly after the event and had made her in-court identification only after a suggestive pretrial procedure affording little basis for confidence in the result.[8] Thus Adaway's testimony, like Wheeler's, was anything but compelling. The state produced no other witness linking Cannon to the crime.

It is against this background that we must assess the evidence the prosecutor withheld from the defense. That evidence was the testimony of Gracie Mae Sherrod. She said she was buying gas at the service station when the beige car pulled in. There were two blacks in the car. The passenger got out and spoke to Sherrod. She recognized him as Robert Daniels. She also knew Cannon but did not see him at the station that night.

On the night of the shooting, Sherrod provided this information to a Birmingham police detective. She showed the detective where Daniels lived. The detective made notes. Sherrod heard nothing further about the crime until after Cannon's conviction. Only then did the defense learn of Sherrod.

This undisclosed information clearly warrants reversal under the *Agurs*

---

**6.** Although these witnesses did not know who the passenger was, they knew he was not Cannon.

**7.** The defense also presented uncontradicted evidence tending to indicate that Josh Stephens, whom Wheeler identified as the driver, had been in North Carolina at the relevant time. At some point Stephens moved from Birmingham to Durham. On Tuesday, May 30, the day before the killing, Stephens attended a job interview in Durham, indicating his willingness to begin work immediately. The prospective employer subsequently left a message at

Stephens' Durham residence indicating Stephens was hired effective Monday, June 5. Stephens received the message and began employment as scheduled. Although this evidence does not establish that Stephens was not in Birmingham on May 31, it does call this aspect of Wheeler's testimony into question.

**8.** In addition, Adaway's identification of Stephens as the driver was questioned by the defense. *See* note 7 *supra*.

standard. As the Court emphasized, "The proper standard . . . must reflect our overriding concern with the justice of the finding of guilt." *United States v. Agurs, supra,* 427 U.S. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 354 (footnote omitted). In the case at bar the "justice of the finding of guilt" was subject to considerable doubt even without the *Agurs* violation. Sherrod's eyewitness testimony positively identifying the passenger said to have committed the crime undoubtedly "creates a reasonable doubt that did not otherwise exist." 427 U.S. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 355.[9] As the Court said in *Agurs,* "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." 427 U.S. at 113, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. Here, the verdict was already of questionable validity, and the additional evidence is of relatively major importance.[10] If the prosecutor's failure to disclose exculpatory information can ever invalidate a conviction, it does so in this case.[11]

## II.

The second constitutional error that infected the truth finding process involved the state's star rebuttal witness, Eleanor Ann Adaway.[12] After running out of gas on a nearby street, Adaway and her husband walked into the Crystal Service Station shortly before the shooting. Adaway testified that she saw the beige car at the pumps with three people in it. She was unable to describe the person in the passenger seat, whose face she was unable to see. She identified the driver as Josh Stephens. At a photographic identification session two

9. Commendably, the state does not advance the disingenuous argument that any reasonable doubt already existed, thus depriving Sherrod's testimony of any practical significance. While it is true that the jury convicted Cannon despite weak evidence, we will not assume that the jury would also have convicted on the basis of the weaker showing that would have been present after Sherrod testified. Sherrod's testimony did not merely track that of other witnesses; she alone could have provided the passenger's identity.

Moreover, in *Agurs* the Supreme Court rejected the "sporting theory of justice" under which undisclosed evidence would be evaluated in terms of its possible effect on an irrational jury. *See* 427 U.S. at 108, 96 S.Ct. at 2400, 49 L.Ed.2d at 352–53. We must assess the evidence's impact on a reasonable factfinder. The defense need not demonstrate that the undisclosed information "probably would have resulted in acquittal." *See* 427 U.S. at 111, 96 S.Ct. at 2401, 49 L.Ed.2d at 354.

10. Indeed, our situation is so extreme that it approaches hypotheticals that have been used to demonstrate instances clearly requiring prosecutors to disclose. *See Ross v. Texas,* 474 F.2d 1150, 1154 (5th Cir. 1973), *cert. denied,* 414 U.S. 850, 94 S.Ct. 141, 38 L.Ed.2d 98 (1973) (conviction would be invalid if prosecutor had withheld "an eyewitness . . . who would have testified that [defendant] was not the robber"); Comment, *Brady v. Maryland and the Prosecutor's Duty to Disclose,* 40 U.Chi.L.Rev. 112, 125 (1972), *quoted with approval, United States v. Agurs,* 427 U.S. 97, 112 n.21, 96 S.Ct. 2392, 2402 n.21, 49 L.Ed.2d 342, 355 n.21 (1976).

11. *Agurs* left some ambiguity concerning in whose mind the omitted evidence *must* be deemed to create a reasonable doubt. The Court said,

> [S]ince after considering [the undisclosed information] in the context of the entire record the trial judge remained convinced of [the defendant's] guilt *beyond a reasonable doubt,* and since *we are satisfied that his firsthand appraisal of the record was thorough and entirely reasonable,* we hold that the prosecutor's failure to tender [the undisclosed information] did not deprive [the defendant] of a fair trial as guaranteed by the Due Process Clause of the Fifth Amendment.

427 U.S. at 114, 96 S.Ct. at 2402, 49 L.Ed.2d at 355–56.

In the case at bar any "thorough and entirely reasonable" analysis of this record could lead to no other conclusion than that the undisclosed information created a reasonable doubt of guilt. We must therefore reverse the denial of habeas relief.

12. The state does not argue that Cannon waived this issue by failing to raise it at trial. The state appellate courts adjudicated the issue on the merits. The issue is therefore open on federal habeas. The rule of *Wainwright v. Sykes,* —— U.S. ——, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) does not foreclose federal courts from reaching issues state courts treat as open. *See, e. g., Francis v. Henderson,* 425 U.S. 536, 542 n.5, 96 S.Ct. 1708, 1711 n.5, 48 L.Ed.2d 149, 154 n.5 (1976).

to three weeks after the shooting, she was unable to identify a picture of Cannon as the person she saw in the back seat. At that time she said that if she ever again saw that passenger, she would be able to identify him. The police did not speak further to Adaway before the trial. They never staged a lineup during which she could view Cannon.

With the trial going badly, however, two detectives went to see Adaway. They told her to come to the courthouse the next day. During a recess, the police told Adaway to "walk down . . . the hall, . . . look at the people in the hall," and to "go to the courtroom door and look through the courtroom door and see if you see anybody you recognize." Cannon was sitting on a bench in the hall with two black women. Whether the circumstances suggested that Cannon was the defendant is unclear. Adaway identified Cannon as the person who had been in the back seat of the car. Asked on cross-examination how she could positively identify Cannon when two to three weeks after the shooting she had been unable to do so, Adaway testified that, "The only way I could is because when I walked down the hall yesterday he looked up at me, and that is when I identified him."

■ The Supreme Court has dealt with identification procedures in a series of decisions spanning the last decade. Such procedures are subject to attack on two separate grounds: due process and right to counsel. The use of evidence derived from suggestive identification procedures denies due process if the testimony is insufficiently reliable.[13] In the case at bar we need not consider whether Adaway's testimony meets this due process standard, for here the state violated Cannon's independent right to counsel. The right to counsel at identification procedures derives from *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The right attaches upon the institution of formal charges, *see Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), and applies to live but not photographic identification procedures. *See United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).[14] In the case at bar we confront a live identification staged after the institution of formal charges. Cannon therefore clearly had the right to the presence of counsel, as the state apparently concedes.

■ Having found that right violated, we look to *Wade* and *Gilbert* to determine the admissibility of Adaway's testimony. The state may not adduce any evidence of

---

13. The linchpin of due process analysis is the identification's reliability. *Manson v. Brathwaite*, —— U.S. ——, ——, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The relevant factors "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.* A court must weigh "the corrupting effect of the suggestive identification," *id.*, against these and any other factors affecting reliability. The Supreme Court sustained a due process attack in *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). It rejected due process attacks in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and *Manson v. Brathwaite, supra*.

14. In its brief the state intimates that *Wade* and *Gilbert* might not apply to the informal identification procedures involved here. We disagree. Though often referred to as "lineup" cases, *Wade* and *Gilbert* govern other types of live identifications as well. *See, e. g., Rudd v. Florida*, 477 F.2d 805, 809–10 n. 5 (5th Cir. 1973); *Rivers v. United States*, 400 F.2d 935, 940 (5th Cir. 1968). Indeed, less formalized procedures present a greater need for safeguards than do traditional lineups. Under *Ash* there is no right to counsel at photographic identification procedures not requiring the defendant's presence, but in any manner of proceedings requiring the defendant's presence the right to counsel attaches. The state does not and could not suggest that Adaway happened upon Cannon inadvertently. *Cf. United States v. Davis*, 487 F.2d 112, 122 (5th Cir. 1973). The police deliberately staged this identification procedure.

an improperly uncounselled identification procedure. *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The state may, however, present an in-court identification by a witness previously subjected to such an uncounselled procedure so long as the state demonstrates "by clear and convincing evidence that the in-court identification [is] based upon observations of the suspect other than the lineup identification." *United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967).[15]

In the case at bar the prosecution did not introduce evidence of the improper showup; it introduced only what purported to be an in-court identification.[16] The question is therefore whether the state has met the *Wade* standard. The record clearly indicates that it has not.

The Supreme Court has listed various examples of the factors that should guide the determination of whether an in-court identification is independent of the uncounselled confrontation. They include "the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification." *United States v. Wade, supra,* 388 U.S. at 241, 87 S.Ct. at 1940. Here Adaway observed the passenger for ninety seconds at about sundown. She had no reason to try to remember him, being unaware that a crime would soon occur. The showup identification came nearly nine months later, in mid-February 1973. She had not identified Cannon earlier; indeed, she had failed to recognize his picture shortly after the shooting.

*Wade* also noted that a court should consider "those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup." *United States v. Wade, supra,* 388 U.S. at 241, 87 S.Ct. at 1940 (footnote omitted). Here our information is incomplete, but we do know that the procedure was suggestive at best. Cannon was sitting with two women; there may have been no other black men nearby. Although Adaway said there were eight or ten black men in the entire area she was to survey, we do not know whether their dress, behavior or location indicated that Cannon, not one of them, was the defendant. Nothing in the record points to a reliable procedure.

The *Wade* factors, moreover, were not intended to be exhaustive. They are but guides to the required inquiry, the independence of the in-court identification from the earlier uncounselled procedure. We may consider any evidence that bears on that inquiry. In the case at bar, the most telling factor is Adaway's own statement that the "only way" that she could identify Cannon at trial was that she had identified him at the previous day's showup. A more compelling statement that the in-court identification bore the taint of the impermissible showup could hardly be expected. This statement, augmented by the long delay between the shooting and the chal-

---

**15.** Some had originally thought that an analogous distinction between evidence of the challenged procedure and in-court identifications was relevant in due process cases, but the Supreme Court rejected that notion in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and *Manson v. Brathwaite,* —— U.S. ——, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Compare *id.* at —— ——, 97 S.Ct. 2255 (Marshall, J., dissenting). Those cases, however, cast no doubt upon *Gilbert,* which continues to provide a per se rule precluding the state from introducing evidence of the impermissibly uncounselled identification procedure.

**16.** Evidence of the showup did go to the jury; the defense elicited it on cross-examination in an effort to undermine Adaway's testimony. As *Wade* itself establishes, the per se exclusionary rule applies only to evidence adduced by the state. *See* 388 U.S. at 240 & n. 32, 87 S.Ct. at 1939 & n. 32. See also *Rudd v. Florida,* 477 F.2d 805, 807 n. 3 (5th Cir. 1973). The defense has the right to conduct such cross-examination, and in doing so it of course does not compromise its ability to challenge the state's use of the in-court identification, the prejudice from which has already been incurred.

lenged showup and by Adaway's inability to recognize Cannon's photograph some two to three weeks after the shooting, wholly refutes the state's assertion that Adaway was able independently to identify Cannon at the time of trial. Far from establishing by "clear and convincing evidence" that the in-court identification was independent of the impermissible showup, this record demonstrates the contrary.[17] The use of Adaway's testimony violated Cannon's sixth amendment right to counsel under *United States v. Wade, supra,* and requires reversal of his conviction.[18]

### Conclusion

We have held that the *Agurs* and *Wade* violations invalidate Cannon's conviction. The district court's decision is REVERSED.

---

17. We do not at this point hold that the state cannot, if it chooses to retry Cannon, attempt to lay the necessary predicate for use of Adaway's testimony on retrial. Although this record renders unlikely the possibility that the state could make the requisite clear and convincing showing, we need not decide at this time whether the testimony before us would be conclusive on that issue even if the state should somehow adduce new and persuasive evidence that the taint of the illegal showup had dissipated. Should the state seek to use Adaway's identification testimony on retrial, measuring the evidence against the standards of *United States v. Wade, supra,* will be a task addressed in the first instance to the state trial court, subject always to appropriate review.

18. As mandated by *Manson v. Brathwaite,* —— U.S. ——, ——, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), we have analyzed the admissibility of the identification testimony without regard to whether it is corroborated by other evidence. But we, like the Court in *Manson,* note that our conclusion is "hardly undermined" by the fact that Adaway's testimony that there were three (not two) people in the beige car is inconsistent with the testimony of *every* other witness who was at the station.