**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Paul Henry PARKER, Defendant-Appellant.**

**Nos. 76–4190, 77–2198.**

United States Court of Appeals, Fifth Circuit.

Dec. 15, 1978.

Rehearing and Rehearing En Banc Denied Feb. 5, 1979.

Arnold Levine, Tampa, Fla., for defendants-appellants in both cases.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Mark L. Horwitz, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee in both cases.

Before TJOFLAT and HILL, Circuit Judges, and HIGGINBOTHAM,* District Judge.

JAMES C. HILL, Circuit Judge.

In these consolidated appeals from his conviction, No. 76–4190, and the order denying his Motion for New Trial, No. 77–2198, Appellant, Paul Henry Parker, claims several errors: (1) the inadequacy of the District Court's *in camera* review of materials subject to the attorney-client privilege which he sought for impeachment purposes; (2) the insufficiency of credible evidence on which the jury could find guilt beyond a reasonable doubt; (3) the pretrial delay violated the statute of limitations and his right to a speedy trial; (4) the Government failed to comply adequately with his request for materials under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Also pending before us is Parker's motion to remand to the District Court and to direct an evidentiary hearing on the motion filed for new trial. We affirm Parker's judgment of conviction and dismiss his motion to remand.

I.

The procedural history of Parker's conviction and the underlying facts are not in dispute.[1] Viewed in the light most favor-

---

* District Judge of the Northern District of Texas, sitting by designation.

1. *See* Brief of Appellee at 2; Reply Brief of Appellant at 2.

able to the Government, *see Glasser v. United States*, 360 U.S. 15, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence disclosed the following sequence of events.

Parker has been President and Business Manager of Teamsters Local Union No. 385 since it was chartered in 1968. The jurisdiction of the local union covers Orange and Lake Counties and surrounding areas in Florida. Under the bylaws of the union, the President is the head business agent and business manager whose duties are to run the local in accordance with the constitution and bylaws. Parker is in full charge of the local; as President he sets the salaries of the union business agents and secretary and has authority for their hiring and firing. He also negotiates the terms of contracts between the union and companies on behalf of the union.

The general procedure for unionizing a company was for the local union representatives to hold an election of the company's employees. If a majority of the employees should vote for unionization, representatives of the local union would call on the company's management and request the union be recognized as the union bargaining agent for the company's employees. If the company's management should refuse the union this recognition, the union would petition the National Labor Relations Board to hold an election of the company's employees. If the union should receive a majority of the votes, the National Labor Relations Board would certify the union as the bargaining agent for the company's employees.

For both Keystone Trucking Company, located in Killarney, Orange County, Florida, and Overland Hauling Company, located in Ocoee, Orange County, Florida, Parker, as president and business manager of the union, had himself taken a lot of action to organize the employees of these companies. However, after the local union had been certified as the bargaining agent for these companies' employees, these two companies refused to meet with the representatives of the union. The union called an election of the employees of these companies, and upon secret written ballot two-thirds of the employees present voted to call a strike.

On February 25, 1971, after obtaining approval of the International Union, Parker, as president of the local union, called a strike against both Keystone Trucking Company and Overland Hauling Company. At this time, Parker established a picket line at the premises of each company and assigned a business agent to each stricken company to assure that each picket line was maintained and all the entrances were covered, to keep a record of the number of trucks crossing the line, and to serve as a general coordinator. After the picket lines were set up, he had discussions and meetings with the business agents and other strikers and instructed them concerning how the picket lines would be conducted.

At the time the strike was called on February 25, 1971, the local union office staff included Parker as president and business manager, Hermon Fulton Witt as business agent since 1969, Charles Newman Sharp as business agent, and Carl G. Crosslin as business agent and as the elected secretary/treasurer. The duties of a business agent are to carry out the assignments of the president and business manager pertaining to union contracts with companies and employees and companies' grievances. Anything other than very minor complaints must be processed at the direction of the president and business manager.

When the strikes were called on February 25, 1971, Parker assigned business agent Hermon Fulton Witt the responsibility of monitoring the picket line at the Keystone Trucking Company and business agent Charles N. Sharp responsibility of monitoring the picket line at Overland Hauling Company.

Witt, the business agent of the local union assigned to maintain the picket line at Keystone Trucking Company, and Charles William Bullard, a union member on the picket line at Keystone Trucking Company, both testified that shortly after the strike began Witt, Bullard and Parker had a conversation in the union hall during which Parker said that he wanted to "rain dyna-

mite" on Keystone Trucking Company, Overland Hauling Company, the Jahna Sand Mine and some other companies. Parker told them that if the dredging machine at the sand mine was blown up, it would stop Keystone and Overland trucks hauling sand. Bullard told Parker that if Parker could get the dynamite, Bullard could create the "shower."

Shortly after the strike was called, in a conversation in the union hall with Witt, Parker asked Witt if he knew anything about dynamite and Witt replied that he did not. When Parker asked if Witt knew anyone who was familiar with dynamite, Witt replied that his son Hermon Ronald Witt had been a demolition expert in the armed services. Parker requested Witt to ask his son if he was interested in doing some bombing. A day or so later, Witt informed Parker that Witt's son wanted to know if there would be any payment involved and Parker said there would not because Witt's son's affiliation with the union was enough of an incentive. Witt was then told by Parker to ask his son if he was willing to put together some bombs if Parker supplied him with the dynamite. When Witt reported back to Parker that his son would make the bombs, Parker told Witt that he knew where he could get the dynamite. Witt heard Parker make a telephone call from the union office to someone he referred to as Jack Forenzo concerning "contracts with tales on them," meaning dynamite fuse and caps, and Parker said that he would send someone down to pick up the "contracts." After the telephone conversation, Parker instructed Witt to travel to the Teamsters' local office in Miami, Florida, and gave him a manilla envelope containing currency to deliver. Witt left the next morning, and at the Miami office gave the envelope to a person identifying himself as Jack Forenzo. This person then directed Witt to a restaurant, where Witt rendezvoused with two men and where a cardboard box was transferred from their automobile to Witt's automobile. Upon returning to Orlando, Witt carried the box into the union hall and placed it on Parker's desk. At this time Witt observed

that it contained dynamite, caps, and fuse. Parker referred to the contents of the box as dynamite and told Witt to remove it from the office. Witt took the box and its contents to his garage at his home in Casselberry, Florida.

Curtis Leroy Love met Witt on the Keystone Trucking Company picket line, sometime before the bombing of the Jahna Sand Mine. At that time, Witt mentioned to him that Witt desired to have some bombings perpetrated in order to coerce a truck company to sign union contracts. Love told Witt he would think about it and let him know at a later date.

Business agent Witt testified that, sometime after taking the dynamite to his home, he had his son fashion some bombs and instructed his son to deliver all but three of the bombs to Bullard at the Keystone Trucking Company leaving the remaining three bombs at Witt's house. Witt testified that later he took the three bombs to the union office and showed them to Parker and others. Witt first stored them in his office desk drawer and later in the ceiling of the union hall.

Bullard and Johnny Mack Brown, a picketer at the Keystone Trucking Company, both testified that on a night early in March of 1971, out on the strike line at Keystone Trucking Company, Bullard received some bombs from Witt's son; that Bullard and Brown had a conversation about bombing the Jahna Sand Mine; and that Bullard and Johnny Mack Brown stored the bombs in Brown's house trailer.

On March 9, 1971, a dynamite bomb was exploded under a boat trailer on the premises of the Keystone Trucking Company. Bullard and Johnny Mack Brown testified that they travelled in Brown's car to the Keystone Trucking Company premises and exploded a five-stick dynamite bomb which they had received a few days before at the picket line at that company.

Witt further testified that sometime before the Municipal Justice Building was bombed on March 19, 1971, a need arose for additional dynamite and that Parker asked

him to ask Bullard if he could acquire some more dynamite. When Witt asked Bullard, Bullard told him that he had a cousin in South Carolina who had access to dynamite. Witt was unable to recall the date but testified that he later accepted a collect call at the local union office from Bullard who stated that he had acquired the dynamite but needed fifty dollars to cover the cost and expenses of returning to Orlando. He asked Witt to wire fifty dollars to Bullard's cousin in Cheraw, South Carolina. At Witt's direction, Carl Crosslin, secretary/treasurer of the union, wired the fifty dollars to Bullard's cousin. Witt further related that the next morning Bullard delivered to him in Orlando two cases of dynamite, a full box of blasting caps, and a short piece of fuse. Witt had informed Parker beforehand of Bullard's trip to South Carolina and he advised Parker of the dynamite's arrival.

Bullard's testimony corroborated Witt's account. Bullard testified that after the March 9th bombing of the Keystone Trucking Company, sometime during the middle of the month, Witt asked him to get some dynamite. He and Johnny Mack Brown and Brown's wife went in Brown's car from Orlando to Cheraw, South Carolina, where Bullard's cousin purchased for him at a hardware store two cases of dynamite, two boxes of caps, and about ten feet of fuse. Once in Cheraw, they did not have enough money to pay Bullard's cousin for the dynamite and get back to Orlando so he telephoned Parker and, in Parker's absence, spoke with Witt who wired the money to his cousin. Bullard and Brown and Brown's wife then returned in Brown's car with the dynamite to Orlando where Bullard delivered the dynamite to Witt.

Witt also testified that after he received the dynamite from Bullard, he told Parker that they did not have the necessary fusing and Parker told him to contact David F. Wingate, business manager of the local labor union, about obtaining some. Witt contacted Wingate and arranged a meeting at which time Wingate gave him approximately one-half a reel of fuse. Witt was unable to recollect the specific date on which this meeting occurred except that he believed it happened in a three-day period before the bombing of the Municipal Justice Building on March 19, 1971.

On April 4, 1971, bombs were exploded on the premises of the Keystone Trucking Company, Killarney, Orange County, Florida, causing some damage to the pavement and a few trucks. Curtis Leroy Love, a picketer at both the Keystone Trucking Company and the Overland Hauling Company picket lines, travelled from his home with Brown and Bullard in Brown's car to the Keystone Trucking Company. Once there, Love and Bullard got out of the car and each threw a lighted dynamite bomb over the fence and under two trucks. The two then got back into the car with Brown and left. After this bombing of the Keystone Trucking Company, Parker indicated to Witt that he was dissatisfied with the bombing because so little damage was done.

Early in April, Parker told Witt to go to the Ramada Inn in Orlando to meet a man and to take with him the bombs which Witt and his son had prepared for Bullard and Brown. Witt met a man named Jim at the Ramada Inn and went to his room with the dynamite, fuse and caps. Bullard and Brown arrived later and received the bombs from Witt. On April 16, 1971, the building housing the terminal office of the Overland Hauling Company, Ocoee, Orange County, Florida, was severely damaged by bomb explosions.

Witt testified that during a conversation he and Parker decided that the fuel tanks at Overland Hauling Company should be bombed. At Parker's request, Witt contacted Curtis Leroy Love about bombing the fuel tanks and Love agreed to do it.

Love himself testified that Witt asked him to bomb the Overland Hauling Company among other places; that on the night of April 16, 1971, he took a bomb and, with Alto Oglesby driving, went to the Overland Hauling Company; that he stepped out of the car and threw the bomb on top of the office building; that he got back in the car and they drove down the highway; and

that the Federal agents stopped them and arrested them before they could escape.

A Bureau of Alcohol, Tobacco and Firearms Special Agent related his version of what occurred that evening. The ATF agent and several officers were at an observation post across the street from the building of the Overland Hauling Company. At approximately 10:30 p. m. a car drove by the building, turned around, and returned and pulled into the parking lot where a person got out of the car and threw a sparking package upon the roof of the building. The person got back in the car and the car drove off. The ATF agent radioed other law enforcement cars in the area not to let the car get away. The car was stopped after it had travelled approximately two-tenths of a mile. Curtis Leroy Love and Alto Oglesby were arrested as the occupants of the car.

Substantial evidence established that the business of Jahna Industries, Inc., Lake County, Florida, and Keystone Trucking Company and Overland Hauling Company, both in Orange County, Florida, included activities affecting interstate commerce. Neither Parker nor any of the coconspirators or accomplices involved in the alleged violations were entered in the National Firearms Registration and Transfer Records to have made application to lawfully transfer or make, or to be lawfully registered to possess, any firearms, destructive devices, or dynamite bombs. See 26 U.S. C.A. §§ 5851–5862. Neither Parker nor any of the coconspirators nor any of the accomplices involved in the alleged violations had made application for or been issued a permit or license to import, manufacture or deal in explosive materials or to transport, ship, or receive explosive materials in interstate commerce. See 18 U.S.C.A. §§ 841–848.

Parker and two other persons were indicted a matter of a few hours before the applicable statute of limitations ran.[2] Count one of the indictment charged that Parker aided and abetted unnamed others in damaging a building located at the Overland Hauling Company. See 18 U.S.C.A. §§ 2 and 844(i). Count two of the indictment charged that Parker aided and abetted others to knowingly possess an unregistered destructive device. See 18 U.S.C.A. § 2; 26 U.S.C.A. §§ 5841, 5861, 5871. Count three essentially charged Parker and his two co-defendants[3] with entering into an unlawful conspiracy to transfer, possess and use destructive devices to damage buildings and properties. See 18 U.S.C.A. §§ 371, 842, 844; 26 U.S.C.A. § 5861. The alleged overt acts commenced February 25, 1971, and continued until April 16, 1971. All these illegal activities were alleged to have been undertaken in furtherance of a union organizing campaign. The jury returned its verdict of guilty on all three counts and a judgment conforming with the verdict was entered. Parker was sentenced to ten years imprisonment on count one, ten years imprisonment on count two, and five years imprisonment on count three, all sentences to run concurrently.

## II.

During cross-examination of Witt, the government's first witness, the attorney for one of Parker's co-defendants advised the District Court that he had under *subpoena duces tecum* two attorneys who had represented Witt, calling for them to produce their office files, correspondence, and memoranda concerning their dealings with Witt and Bullard which would attach to their credibility as government witnesses. The two attorneys were present, but refused to produce the materials for defense inspection under a claim of attorney-client privilege.[4] Pursuant to defense counsel's request, the district court ordered Witt's

---

**2.** Parker also asserts that the limitation of the statute had been reached. We disagree. Part IV. A., *infra*.

**3.** Ashley B. Burch, Jr., a union member and David W. Wingate, president of the Laborers'

local union are not involved in the appeals here considered.

**4.** Parker's attorney joined in the request.

two former lawyers to make an *in camera* presentation of the general nature of their attorney-client relationships and the general contents of their files.

The district judge spent two hours with the two attorneys reviewing their files *in camera.* Afterwards, the district judge made his findings in open court. He explained that he received the files regarding their dealings with Witt and Bullard without swearing the attorneys since they were officers of the court. With respect to the first attorney's files, the district judge stated that he went through it as carefully as he could and culled out three documents: Bullard's sworn statement of July 22, 1975, Bullard's letter to his attorney on February 19, 1975, and Bullard's affidavit of September 11, 1975. Since Bullard authorized his attorney to reveal these materials, the district judge found the attorney-client privilege waived with respect to these three documents.[5] Three other letters from Witt to the first attorney were culled from the attorney's files but were found to be privileged and were not provided to the defense, though they were marked as the court's exhibits and sealed in the record for appellate review. Most significantly, the district judge found that the substance of these latter three exhibits was contained in the first three which were turned over to the defense. With respect to the second attorney, the district judge found from their discussion that no evidence contained in his files, either within or without the privilege, could be helpful to the defense. The district judge found that this second attorney had an attorney-client privilege with both Witt and Bullard limited to his representation in efforts to obtain grants of immunity for them and declined to enforce the sub-

poena. The defense attorneys were advised, however, that they could call the second attorney to the stand and the district judge would rule on specific claims of the privilege. These rulings were accepted by the defense attorneys without objection.

On appeal, Parker contends that a careful reading of the *in camera* hearing transcript discloses that the district court did not personally examine and inspect the files of the two attorneys but merely engaged in an *in camera* colloquy allowing the two attorneys merely to relate the contents of their files. Even accepting this scenario, we cannot conclude that the district judge committed reversible error.[6]

We agree with Parker, that a better procedure is possible to avoid placing a defendant in the dilemma of not knowing what documents were produced but not ordered delivered to defense counsel. First, each document produced could have been identified on the record for purposes of review. Second, the district judge could have personally examined and ruled on each document, on the record.[7] Absent the custodian's improper withholding of materials, this would preclude the omission of possibly exculpatory material because of simple ignorance of its existence. Finally, the district court could have detailed the methods used in examining the documents and his findings to all counsel. However, that the district court could have done more does not require us to set aside Parker's conviction. The district court here was satisfied with the procedure used. We cannot say that the district court abused the substantial discretion afforded under Fed.R.Crim.P. 17 to oversee the subpoena process. *See generally* 8 Moore's Federal Practice §§ 17.01–11; 1 Wright's Federal Practice and Proce-

---

5. Alternatively, the district judge concluded that these documents contained material which could be used to impeach Witt's testimony and Bullard's anticipated testimony which were communications made by the client to his attorney during or before the commission of a crime or fraud and therefore outside the privilege.

6. The *in camera* hearing transcript could also be read to suggest that the district judge went through the files with the attorneys. Given our acceptance of the defense scenario, there is no need to remand for further proceedings to determine what actually took place, as Parker alternatively suggests.

7. *See* note 6, *supra.*

dure §§ 271–79.[8] Therefore, we are satisfied with the procedure followed.

### III.

█ Parker also seeks a reversal on the grounds that the Government's two major witnesses, Witt and Bullard, had perjured themselves on numerous occasions and their testimony contains irreconcilable conflicts. More specifically, he urges that the evidence against Parker was insufficient as a matter of law, first, because the jury could only believe Witt's testimony as corroborated by Bullard who had earlier perjured himself and, second, because the Government improperly depended on the jury's knowledge that both Witt and Bullard had been convicted of these same bombings and were serving lengthy sentences at the time they testified.

Parker cites numerous instances of prior inconsistent statements to support his argument. The jury heard all the impeaching testimony and saw the numerous impeaching documents. In addition, the jury heard explanations of the prior inconsistent statements by the witnesses. Here the proof of the existence of a conspiracy rests on a framework of proven and uncontested facts; the coconspirators themselves admitted committing the bombings in furtherance of their illicit agreement. Even a cursory study of this record demonstrates substantial evidence of a guilty nexus between Parker and the conspiracy. *See generally, e. g., United States v. Evans,* 572 F.2d 455, 469 (5th Cir. 1978). Notwithstanding the alleged unreliability of the Government's key witnesses, the jury was the proper arbiter of the witnesses' credibility. *See, e. g., United States v. Anderson,* 574 F.2d 1347 (5th Cir. 1978); *United States v. Cravero,* 530 F.2d 666 (5th Cir. 1976).

Parker's reliance on *United States v. Fleetwood,* 528 F.2d 528 (5th Cir. 1976), is misplaced. He contends that the Government improperly brought to the jury's attention that both Witt and Bullard had been convicted of a felony and had been granted immunity to testify and had some personal advantage or vindication to accomplish. Given our reading of the record testimony and instructions, we believe that the Government was merely attempting to disclose adverse facts relevant to the witnesses' credibility in anticipation of damaging cross-examination and defense argument. Such a tact is permissible. *See United States v. Fleetwood,* 528 F.2d at 533; *United States v. Harrell,* 436 F.2d 606 (5th Cir. 1970); *United States v. Aronson,* 319 F.2d 48 (2d Cir.), *cert. denied,* 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963).

### IV.

Parker contends that this case was not brought in a timely manner and that the prosecution should be barred for three reasons: (1) the applicable statute of limitations had run; (2) the delay from the commission of the offense to the indictment and trial denied him his constitutional right to a speedy trial guaranteed under the Sixth Amendment; (3) the delay from the commission of the offense to the indictment and trial denied him his constitutional right to a fair trial guaranteed under the Due Process Clause of the Fifth Amendment. Though we are not persuaded by these contentions, we address each in turn.

### A.

█ Parker's contention that the applicable statute of limitations had run before he was indicted is based on the novel notion that two leap years, providing two extra days to be measured against the limit, had passed during the interim. The indictment alleged two substantive offenses based on the bombings of the Overland Hauling Company on April 16, 1971, and one conspiracy offense, participating in a conspiracy

---

8. Given the voluminous impeaching evidence marshalled against Witt and Bullard, it would be difficult to imagine that the District Court's *in camera* procedure was error so harmful as to require reversal. However, since we conclude that the district court did not commit an abuse of discretion, there is no error to characterize as either harmless or harmful. Fed.R.Crim.P. 52.

which began on February 25, 1971, and continued through the April 16, 1971, bombing of the Overland Hauling Company.[9] The indictment was returned by the Federal Grand Jury on April 15, 1976.

We are satisfied that the relevant five year statute of limitations was met.[10] *Cf. United States v. Brasco,* 516 F.2d 816, 818 (2d Cir. 1975) (Without specifically addressing the issue, intervening leap year was deemed not critical). The two substantive offenses were based on the April 16, 1971, bombing which occurred within five years of the filing of the indictment. Though the conspiracy began outside the limitation period, the conspiracy continued and overt acts were committed within the limitation period. This is sufficient. *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *United States v. Ashdown,* 509 F.2d 793, 798 (5th Cir. 1975).

### B.

Parker also argues that he has been denied his constitutional right to a speedy trial under the Sixth Amendment, by the delay from the commission of the offenses on April 16, 1971, to the date the indictment was returned, April 15, 1976, and the date his trial began, September 13, 1976. We cannot agree.

■ The Sixth Amendment right to a speedy trial does not limit the time within which an initial charging paper must be filed against an unarrested subject, but it does limit, to some extent, preindictment delay once a defendant has been arrested. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Shaw,* 555 F.2d 1295 (5th Cir. 1977); *United States v. Avalos,* 541 F.2d 1100 (5th Cir. 1976). Thus, the delay between the offense and the indictment is of no moment under the Sixth Amendment Speedy Trial Right.

■ However, the Sixth Amendment right to a speedy trial does impose some limit on the delay between bringing charges against an accused and beginning the trial. In applying the Sixth Amendment right to a speedy trial to the period from arrest/indictment to trial, the four factors to be considered are: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *United States v. Avalos,* 541 F.2d at 1110. "The length of the delay serves in part merely as a 'triggering mechanism.' . . . [T]he threshold question is whether this delay requires further consideration of the speedy trial claim." *Id.* at 1110–11 (citations omitted). *United States v. Wentland,* 582 F.2d 1022 (5th Cir. 1978) and cases cited. In this case, the five-month delay between Parker's indictment and his trial was not unreasonable, and it does not require further consideration of the speedy trial claim. The reasonableness of the delay is emphasized by the fact that the trial was scheduled for July 6, 1976, but Parker substituted counsel prior to the trial date and, on oral application of counsel for Parker and the United States Attorney, the trial date was rescheduled to September 13, 1976. Parker never sought an earlier trial nor has he shown any prejudice resulting from the five-month period between indictment and trial. Thus, there is no merit to his claim of denial of the Sixth Amendment right to a speedy trial.

### C.

■ Parker's claim of a denial of Due Process under the Fifth Amendment resulting from the lapse of time between the commission of the offenses and his indictment is also subject to well-recognized principles of law which require our rejection of his argument.

---

**9.** The bombing at the Overland Hauling Company occurred at approximately 10:30 p. m.

**10.** 18 U.S.C.A. § 3282 provides:
Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

In *United States v. Shaw,* 555 F.2d 1295 (5th Cir. 1977), this Court explained that the statute of limitations normally provides the primary protection against overly stale criminal charges. The sole constitutional limit on the delay between the commission of an offense and the initial accusation regarding the offense is the Due Process Clause of the Fifth Amendment. In order to obtain relief under the Due Process Clause of the Fifth Amendment, a showing of prejudice by the delay in the bringing of the charges is not enough without more. The reasons for the delay must be examined to determine whether the prosecution's actions violated "fundamental conceptions of justice" or "the community's sense of fair play and decency." *Id.* at 1299; *United States v. Avalos,* 541 F.2d at 1107.

Here again we note that the offenses were alleged to have been committed on April 16, 1971, and the indictment was returned on April 15, 1976. During the interim between the crimes and Parker's indictment, two of Parker's alleged coconspirators, Witt and Bullard, were indicted in July of 1972 and convicted at a joint trial in April of 1973 for their participation in the various bombings. Their testimony goes a long way in explaining the delay in seeking an indictment against Parker.

Witt testified at Parker's trial that he did not take the stand at his own trial. On appeal of his conviction, in various motions for release under 28 U.S.C.A. § 2255, in motions for reduction of sentence, in letters to his wife, in letters to the sentencing judge, in applications to the parole board, in statements to parole officers and others, not only did he not implicate Parker in the offenses, but he completely denied his own participation. He told the jury at Parker's trial that in the last part of June 1975, after his last petition for relief in the form of a motion for reduction of sentence and letter requests to the sentencing judge had been denied, he decided to "tell the truth." After he was granted immunity, he appeared before the Federal Grand Jury in Orlando, Florida in November of 1975 and gave testimony substantially as he testified at Parker's trial, implicating himself, Bullard, and Parker in the offenses.

During the course of Parker's trial, Bullard testified that at his own trial he lied when he denied his participation in the offenses and any knowledge of any participation of Witt or Parker. On appeal of his conviction, in motions for release under 28 U.S.C.A. § 2255, in motions for reduction of sentence, in letters to attorneys and others, in applications to the parole board, in statements to parole officers and on other occasions, he maintained his false denial of his participation in the offenses, and denied any knowledge of the participation of Witt and Parker. Bullard was granted immunity, and testified before the Grand Jury in November of 1975, but again did not implicate Parker. His application for parole was turned down by the parole board in February of 1976, when he was given a three-year set-off until his next parole hearing in 1979. He testified at Parker's trial that after this he decided to tell the truth and contacted the agents about again testifying before the Grand Jury. On April 15, 1976, he again testified before the Grand Jury and finally disclosed Parker's involvement.

On the basis of the testimony of these and other witnesses at Parker's trial, we conclude that he has not satisfied either of the two requirements to support a claim of denial of Due Process under the Fifth Amendment. First, Parker has failed to show that he was prejudiced by the delay between the commission of the offense and the indictment. Apart from Parker's implication in the offenses, the evidence was clear that a conspiracy existed furthered by overt acts as alleged. While the testimonies of witnesses were vague in some instances as to specific times and minor details, their testimonies were positive as to acts committed by Parker while participating in the conspiracy. Secondly, Parker has failed to satisfy the second requirement of the due process test. The record negatives any suggestion that delay between the criminal acts charged and the indictment was some sort of tactical move by the Government. It was not until Government witness Witt testified before the Grand

Jury in November of 1975, that the Government had a witness to testify to Parker's participation in the offenses. However, at that point the Government had no corroboration of the testimony of Witt implicating Parker, since Bullard then was still denying Parker's involvement. It was not until April of 1976, when Bullard appeared before the Grand Jury and testified about Parker's participation, that the Government had corroborating testimony to that of Witt implicating Parker. These circumstances clearly negative any claim of delay on the part of the prosecutor being a tactical move by the Government.

The Government's delay in seeking an indictment against Parker did not contravene his Due Process right. *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Shaw,* 555 F.2d 1295 (5th Cir. 1977); *United States v. Avalos,* 541 F.2d 1100 (5th Cir. 1976).

## V.

■ Parker, through new counsel replacing trial counsel, filed a Motion for New Trial on April 17, 1977, in which he alleged that the attorney for the Government failed or neglected to provide to his trial attorney tape recordings and transcripts of interviews between witnesses and Government agents. The hearing on the Motion was heard by the trial judge who issued an order denying the Motion for New Trial. Parker here appeals from that order in No. 77–2198. We affirm the denial of the Motion which the district court considered.[11]

At the hearing on the motion for a new trial, Parker introduced four exhibits which he claimed constituted the evidence withheld by the Government. A review of each exhibit along with the trial testimony is necessary to frame this issue properly.

Defense Exhibit 1 was a red and black box bearing notations "Interview 12–14–71,

Bud and Patsy Love, Roman Numeral III," containing a tape recording. An ATF special agent identified this tape as a recording of an interview in his presence between another special agent, who had worked in the Witt and Bullard trial, and Curtis Leroy Love and his wife, Ruth Love, in the Orange County Jail on December 14, 1971, just prior to the Witt and Bullard trial. Exhibit B of Parker's motion for a new trial was a transcript of a portion of this tape, which was played at the motion hearing. The relevant portion of the recording of the Government's December 14, 1971, interview with the Loves is set forth in the transcript for the hearing on the motion.[12] Curtis Leroy Love was questioned as follows:

Did he [Parker] know anything, did he know Overland was going to get hit? Not to my knowledge he didn't. Now I couldn't say for sure. I don't know. I don't know much about anything.

Excuse me. As far as you know you say Paul Parker, you don't think knew anything about any of this?

I really don't think he did, not to my knowledge he didn't. He never mentioned nothing to me about it or anything else, not to my mind.

Never got any indication at all of anything that he may have said or the way he acted or anything that he knew? How about Charlie Sharp?

Not as I know of.

Defense Exhibit 2 consists of a red and black box, bearing notations "Interview of Patsy Love, 12–16–71, Roman Numeral I," containing a tape recording. This tape was not played at the hearing.

Defense Exhibit 3 was a tape recording, bearing notations "11–17–71, Love and Oglesby, Orange County Jail." An ATF special agent identified this as a tape bearing notations in his handwriting. This tape was accepted by the parties as being inaudible.

---

**11.** This affirmance is not to be confused with the explicit withholding of our consideration of Parker's Motion for New Trial Based Upon Newly Discovered Evidence filed in June of 1978. *See* discussion *infra.*

**12.** The Court Reporter's transcript of the tape as quoted here is not identical to Parker's transcript which was attached to his Motion for New Trial. However, the substance of Curtis Leroy Love's statements in both is alike.

Defense Exhibit 4 was a tape, bearing notations "*U. S. v. Witt,* 2–6–73, at two o'clock with Charles Ballard." An ATF special agent testified that he did not recognize whose handwriting the notations were in; that he did not know anything about it; and that he did not think he had ever seen the tape before. This tape was accepted by the parties as being inaudible, as well.

The attorney who had represented Witt at his trial in 1973 and until June of 1975, and who had represented Bullard on appeal and until November of 1975, testified that the four tapes were from his files.[13] He further testified that after the sentencing of Parker they were made available to Parker's trial attorney. He had forgotten about the tapes until after Parker's criminal trial but, when Parker's attorney had advised him of Love's rebuttal testimony, he remembered the tapes.

Defense Exhibits 1 and 2 had been furnished to this attorney for Witt and Bullard by the Government in pretrial discovery in advance of the Witt trial in 1973 in response to requests for *Jencks*[14] and *Brady*[15] materials. He had been furnished Defense Exhibits 3 and 4 by the prosecutor in the Witt and Bullard trials, following a discussion with regard to *Jencks* and *Brady* material prior to their trial. When received, Defense Exhibits 3 and 4 were inaudible. He testified that he had used the Defense Exhibit 1 and a transcript to attempt to impeach Government witness Curtis Leroy Love, on the basis of Government promises, and the transcript of the Witt and Bullard trial referred to this part of the tape. The only portion of the tape of the interview that he could recall as being of an exculpatory nature as to Parker was in the portion of the tape played at the motion hearing quoted above. The type of exculpatory statement that he remembers Ruth Love making in the tapes was that she did not

believe that Parker was involved. Finally, he admitted that, in response to the defense *subpoena duces tecum* to produce his files for defense counsel inspection at the Parker's trial, he did not specifically reveal the fact of his possession of any tapes to the trial judge at the *in camera* inspection of his files. His explanation was that he did not have an independent recollection of any statements on the tapes about Parker, since the last time he had heard the tapes was during the Witt trial.

Parker's trial attorney testified at the motion hearing that prior to his replacing the attorney who handled the case pretrial, in June of 1976, the pretrial attorney had filed a Motion for Discovery and Inspection dated May 7, 1976, that requested any *Brady* or any *Jencks* material, anything exculpatory for the Defendant. Parker's trial attorney further testified that there was an agreement between him and the Government that *Jencks* and *Brady* material would be made available to the defense, an agreement with which he believed the Government complied. Before and during Parker's trial, he did not receive any tapes or transcripts of Government interviews with Curtis Leroy Love or Ruth Love. After Parker's trial and sentencing, he learned about the tapes from the attorney for Witt and Bullard; he himself had never heard the tapes. Parker's trial attorney admitted that the Government had advised him of a willingness to pursue discovery under Fed. R.Crim.P. 16, but, after the magistrate ordered reciprocal discovery, he declined. He also admitted that he was made aware by the prosecutor that he was not going to be supplied any documents or transcripts readily available from reviewing the public records of the prior two related trials. He also admitted being advised by the prosecutor's letter of August 30, 1976, as follows:

---

**13.** This attorney also assisted and worked with the defense attorney in the civil suit brought by Overland Hauling Company against the union, Parker, Witt, Love and Oglesby. That same defense attorney filed the briefs here. Though the two attorneys generally discussed Parker's defense, the tapes were not discussed.

**14.** 18 U.S.C.A. § 3500.

**15.** *Brady v. Maryland,* 375 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Please be advised that numerous witnesses who appeared in the cases of *U.S.A. v. Love and Oglesby,* No. 71–33–Orl–Cr and *U.S.A. v. Witt and Bullard,* No. 72–68–Orl–Cr, may appear in the above-captioned case. For your information, Mr. Parker and Mr. Burch testified in the case of *Witt and Bullard.*

It is my understanding that the Clerk of the Court has copies of the transcripts of those earlier trials. The Government is therefore not intending to supply copies of the transcripts presently in the Clerk's possession but is simply advising you of their existence. If you desire copies of same, you may act at your own discretion.

He further acknowledged that he was aware of the prior two related trials and had examined records of some of the trials, but he insisted that he was not aware of the existence of any tapes. He also admitted that he never made any representations to the Government that he was unable to obtain transcripts of Witt's trial.

The Assistant United States Attorney who handled Parker's prosecution also answered questions at the motion hearing. He stated to the Court that, when he replaced the Assistant United States Attorney who had successfully prosecuted Witt and Bullard, it also became his responsibility to handle the appeal in Witt's case. In doing so, he read the entire transcript of Witt's trial and he became aware of the tape of Love's statement, since it was referred to in approximately thirty pages of the transcript of the Witt trial because Love played such a key role in the bombings. He never heard the Love tape, until it was played at the motion hearing. He did not consider it was relevant to listen to the tapes in preparation for Parker's trial, since Love's statements were simply that Witt told Love to do the bombings. He also reviewed the testimony of Ruth Love in the transcript of the Witt trial where she made the statement to the effect that she did not think Parker was involved. The Assistant United States Attorney who handled Parker's prosecution also acknowledged to the District Court that he had not provided Parker's attorney with the tapes or any

transcripts. His position was that, on the basis of the prosecutor's letter of August 20, 1976, notifying the defense that the Government was not going to produce any of the public records that could be ascertained from review of the two prior trials, he was not obliged to do so, since Parker's attorney made no request of the Government for any tapes even though the tapes were clearly referred to in the Witt trial.

Looking at the posture of the Government's evidence against Parker in the context of the total record, there was evidence, apart from any testimony of Love, establishing the existence of a conspiracy to commit the charged offenses between Witt, Bullard, Love, Brown, Oglesby, and others. Only the testimonies of Witt and Bullard directly implicated Parker as a coconspirator. Love, testifying as a witness in the Government's case-in-chief, admitted his participation in the bombings and that his participation had been under the direction of Witt in association with accomplices Bullard, Brown and Oglesby. In his direct testimony, Love did not testify that Parker directed his actions, or that he discussed the bombings at the time with Parker, or even that Parker had any knowledge of the bombings. In his defense, Parker testified, disclaiming any wrongdoing or any awareness of others' wrongdoing, and, on cross-examination he said that he talked with Love before Love's trial but never cautioned Love about "keeping his mouth shut." In the Government's rebuttal, Love testified to the contrary concerning instructions from Parker prior to Love's trial. On rebuttal, Love testified that after he was arrested for his part in the bombings, Parker told him to keep his "mouth shut" and his "bowels open." He said that Parker never talked to him like that before.

Recently, this Court had occasion to consider the doctrine of *Brady v. Maryland,* 375 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in light of the Supreme Court's most recent consideration of the area in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1975). In *United States v.*

*Anderson,* 574 F.2d 1347 (5th Cir. 1978), this Court carefully set out the proper analysis for considering various types of defense claims under *Brady,* and we need not repeat that analysis here. Assuming only for the sake of our analysis, as the court did in *Anderson,* that the Government suppressed favorable evidence, Parker has not established the materiality of the suppressed evidence.

Here, there was no specific defense request for the tapes.

When there has been no specific defense request, the failure to disclose information violates due process only "if the omitted evidence creates a reasonable doubt that did not otherwise exist. *Agurs v. United States, supra,* 427 U.S. at 112, 96 S.Ct. at 2401; *Cannon v. Alabama, supra* [558 F.2d 1211 (5th Cir. 1977)]. The Supreme Court has explained:

> This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. *United States v. Agurs, supra,* 427 U.S. at 112–13, 96 S.Ct. at 2402 [(]note omitted).

*United States v. Anderson,* 574 F.2d at 1354–55. Here, the tapes arguably could be used to impeach Love.

In *Garrison v. Maggio,* 540 F.2d 1271 (5th Cir. 1976), this Court held that before a new trial must be granted because of the prosecutor's failure to disclose purely impeaching evidence not concerning a substantive issue, in the absence of a specific defense request, a defendant must demonstrate that the undisclosed evidence probably would have resulted in an acquittal.

*United States v. Anderson,* 574 F.2d at 1354. We have carefully studied the entire record and the parties' arguments. We cannot conclude that either of these two tests for materiality are satisfied here. Therefore, we do not accept Parker's *Brady* argument. *See generally United States v. Anderson,* 574 F.2d 1347 (5th Cir. 1978) and cases cited.

## VI.

Finally, we must consider Parker's "Motion to Remand Proceedings to Trial Court and to Direct an Evidentiary Hearing on the Motion Filed for New Trial and to Continue Oral Argument." The motion to continue oral argument was denied. The motion to remand for an evidentiary hearing on the *second* Motion for New Trial was carried with the case. This second motion for new trial, filed in June of 1978 contains issues separate from, though somewhat related to the *first* motion for new trial which was filed in April of 1977, the denial of which Parker appeals here in No. 77–2198. The District Court did not require our remand to *consider* the motion. Recently, this Court explained the appropriate procedure in *United States v. Fuentes-Lozano,* 580 F.2d 724 (5th Cir. 1978):

> A motion for a new trial may be presented directly to the district court while the appeal is pending; that court may not grant the motion but may deny it, or it may advise us that it would be disposed to grant the motion if the case were remanded. Alternatively, as here, to avoid delay, the appellant may seek a remand for the purpose of permitting the district court fully to entertain the motion.

The District Court followed this procedure. During the pendency of the appeals in Nos. 76–4190 & 77–2198, Parker filed a "Motion to Consolidate" these appeals with his appeal from the District Court's denial of the *second* motion for new trial, No. 78–3296. On November 3, 1978, the motion to consolidate was denied. Therefore, the Motion to Remand which was carried with these appeals is DISMISSED.

AFFIRMED.